IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

No. 1:25-cv-440

CAPE FEAR RIVER WATCH and
HAW RIVER ASSEMBLY,

    Plaintiffs,

    v.

THE CITY OF ASHEBORO;
INDORAMA VENTURES USA, LLC;
and STARPET INC.,

    Defendants.

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**
Fed. R. Civ. P. 7

Cape Fear River Watch and Haw River Assembly (collectively, "Conservation Groups") by and through counsel, file these Clean Water Act claims pursuant to 33 U.S.C. § 1365 against the city of Asheboro ("the city" or "Asheboro") and Indorama Ventures USA, LLC, and StarPet Inc. (together, "StarPet") (collectively "Defendants") and allege as follows:

## STATEMENT OF THE CASE

1.    For at least a decade, Asheboro's wastewater treatment plant has been discharging 1,4-dioxane, a cancer-causing chemical, into Haskett Creek upstream of the drinking water supplies for nearly 900,000 North Carolinians.

1

2.     Much of Asheboro's toxic 1,4-dioxane pollution originates from StarPet, a polyethylene terephthalate ("PET") plastics manufacturer that pays Asheboro to accept its industrial waste into the city's municipal wastewater system.

3.     While StarPet is the leading source of 1,4-dioxane in Asheboro's wastewater system, the city also accepts 1,4-dioxane laden waste from other industrial users, including the Great Oak Landfill ("the landfill").

4.     Because Asheboro does not treat its effluent to remove 1,4-dioxane, StarPet's and the landfill's pollution flows into the wastewater plant, passes through the facility, and dumps into Haskett Creek. Despite knowing about its 1,4-dioxane discharges for a decade, the city has flouted its legal obligations to control this industrial pollution.

5.     Adding insult to injury, Asheboro has teamed up with other known sources of 1,4-dioxane to fight against toxic chemical regulation. Together, these polluters have systematically attempted to dismantle the North Carolina Department of Environmental Quality's (the "Department") authority to regulate 1,4-dioxane and other harmful chemicals across the state.

6.     Emboldened by this fight against toxic chemical regulation, Asheboro has allowed StarPet to *increase* its 1,4-dioxane pollution over the last several months. Consequently, the levels of 1,4-dioxane in Asheboro's discharges have skyrocketed to the highest levels ever documented from a municipal wastewater plant over the course of North Carolina's decade-long fight against this water quality crisis.

7.     Defendants' industrial pollution has devastating consequences. Communities downstream of the wastewater plant routinely detect 1,4-dioxane in their drinking water, often at levels far exceeding the cancer risk advisory level of 0.35 parts per billion ("ppb")[1] set by the U.S. Environmental Protection Agency ("EPA"). Conventional drinking water treatment technologies cannot remove 1,4-dioxane from drinking water at either the utility or the household level, meaning that Defendants' pollution not only flows through downstream rivers, but also through municipal water utilities, and into homes, businesses, churches, and schools.

8.     Asheboro and StarPet have an obligation to prevent this type of pollution from entering the environment. The Clean Water Act's pretreatment program requires cities like Asheboro to take certain actions that ensure pollution is controlled at the industrial source *before* it reaches the municipal wastewater system. The pretreatment program requires industrial users like StarPet to operate their facilities in a way that does not cause the wastewater plant to contaminate downstream waters.

9.     Defendants refuse to comply with these common-sense obligations.

10.    Asheboro is violating Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and its National Pollutant Discharge Elimination System ("NPDES") permit because it is discharging 1,4-dioxane without authorization. Asheboro is also failing to properly manage its pretreatment program in a manner that controls toxic 1,4-dioxane

---

[1] Parts per billion ("ppb") is the same unit of measurement as micrograms per liter or ("µg/L"). For clarity, all units will be reported in ppb, unless otherwise noted.

pollution at the industrial source, in violation of its NPDES permit, federal, state, and local law. 33 U.S.C. § 1317(b), (d); 40 C.F.R. pt. 403 (2024); 15A N.C. Admin. Code 02H .0900 (2019); Asheboro, N.C., Code of Ordinances ch. 52 (2023); N.C. Dep't of Env't & Nat. Res., *NPDES Permit NC0026123* (2012).

11.     StarPet is violating the Clean Water Act by failing to properly control its industrial chemical pollution in violation of federal and state pretreatment requirements and Asheboro's local sewer use ordinance. 33 U.S.C. § 1317(b), (d); 40 C.F.R. pt. 403; 15A N.C. Admin. Code 02H .0900; Asheboro, N.C., Code of Ordinances ch. 52. StarPet is also violating conditions in its industrial user permit, in violation of federal pretreatment rules. 40 C.F.R. pt. 403; City of Asheboro Wastewater Treatment Plant, *IUP Number 2228* (2022).

12.     Conservation Groups seek declaratory relief, injunctive relief, civil penalties, and costs of litigation, including reasonable attorney and expert fees and expenses.

## JURISDICTION AND VENUE

13.     Conservation Groups bring this enforcement action under the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365. This Court has subject matter jurisdiction over this action pursuant to 33 U.S.C. § 1365(a) and 28 U.S.C. § 1331.

14.     This Court has personal jurisdiction over each of the parties in this case because this suit relates to activities or occurrences taking place in the state of North Carolina, specifically, Defendant Asheboro's operation of a wastewater plant in

4

Asheboro, North Carolina and Defendant StarPet's operation of a manufacturing facility in Asheboro, North Carolina.

15. Each Defendant has purposefully availed itself of the benefits of operating a wastewater plant and manufacturing facility, respectively, in North Carolina. Plaintiffs' claims arise from pollution caused by these facilities and Defendants' failure to comply with legal requirements to control this pollution.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 33 U.S.C. § 1365(c)(1). The Defendants both operate—and all the challenged discharges and permit violations originate and are occurring—in Asheboro, North Carolina, within the Middle District of North Carolina.

17. Conservation Groups have complied with the pre-suit notice provisions of the Clean Water Act. Pursuant to Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A) and 40 C.F.R. pt. 135, on March 26, 2025, Conservation Groups sent notices of intent to file suit under the Clean Water Act via certified mail to each Defendant, the Administrator of the EPA, the Regional Administrator of the EPA for Region Four (the region where the alleged violations occurred), and the North Carolina Department of Environmental Quality (the water pollution control agency for the state where the violations occurred), with a courtesy copy to the United States Attorney General. These notice letters are hereinafter referred to as "Notices," and are attached hereto as Exhibit A (Notice of Intent to Sue City of Asheboro and proof of service) and Exhibit B (Notice of Intent to Sue Indorama Ventures USA, LLC and StarPet Inc. and

5

proof of service), each incorporated by reference herein. The Notices complied with 33 U.S.C. § 1365(b)(1)(A) and with 40 C.F.R. Part 135, Subpart A. More than sixty (60) days have passed since the Notices were served on Defendants and these agencies. *See* 40 C.F.R. § 135.2(c) (notice of intent is deemed to have been served on the postmark date).

18.     Neither EPA nor the Department has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or any North Carolina court to redress the violations of the Clean Water Act by Defendants City of Asheboro or StarPet. In addition, neither EPA nor the Department has commenced an administrative civil penalty action under Section 309 of the Clean Water Act, 33 U.S.C. § 1319(g)(6), or under a comparable North Carolina law, to redress the violations of the Clean Water Act by these Defendants.

19.     Conservation Groups will, immediately upon receipt of a file-stamped copy of this Complaint, mail a copy to the Administrator of the EPA, the Regional Administrator of the EPA, and the Attorney General of the United States pursuant to 40 C.F.R. § 135.4, along with a signed statement by Conservation Groups' counsel as to when the Complaint was filed.

## PARTIES

**Plaintiff Cape Fear River Watch and Its Members**

20.     Cape Fear River Watch is a "citizen" within the meaning of the Clean Water Act, 33 U.S.C. § 1365(a) and (g).

21.     Cape Fear River Watch is a North Carolina 501(c)(3) nonprofit organization dedicated to protecting and improving the water quality of the Cape Fear River Basin for all people through education, advocacy, and action. Cape Fear River Watch's principal place of business is located at 617 Surry Street, Wilmington, North Carolina 28401.

22.     Cape Fear River Watch is tasked with protecting water quality from the headwaters of the basin, including the Deep River, through the lower stretches of the waterway where the Cape Fear River meets the Atlantic Ocean.

23.     Cape Fear River Watch advocates at the local, state, and federal levels on behalf of the Cape Fear River and the people who use and rely upon it.

24.     The organization has been a leading voice combating industrial chemical pollution, including 1,4-dioxane, because many of its members live in the Lower Cape Fear River Basin and therefore suffer from the presence of toxic chemical pollution dumped by numerous municipal and industrial sources, including Defendants.

25.     Defendants' pollution directly harms Plaintiff Cape Fear River Watch because it has had to divert time, money, and resources to addressing Asheboro's 1,4-dioxane pollution that could have been spent furthering its mission and member priorities

7

elsewhere. If this pollution were redressed, Cape Fear River Watch could return its focus to other pressing issues affecting the Cape Fear River Basin.

26. Defendants' pollution also harms the organization's members. Cape Fear River Watch has more than 1,000 members, many of whom live near, drink water from, and fish, paddle, boat, or work in and along the Cape Fear River, downstream of Defendants' discharges.

27. Some of these members rely on, use, and drink water in their homes, restaurants, businesses, schools, places of worship, and public facilities that is sourced from the Cape Fear River downstream of Defendants' discharges. Some members have also had to expend significant sums of money to obtain alternative sources of water, or to treat the water flowing into their homes, to avoid risking health problems associated with drinking 1,4-dioxane laden water. These members thus have property, economic, and health interests in the waters downstream of Defendants' discharges.

28. Cape Fear River Watch also has members who have historically fished, swam, paddled, and/or played in the Cape Fear River but no longer do so, have decreased their frequency of doing so, or no longer find as much enjoyment in doing so as a result of their concerns about industrial pollution like 1,4-dioxane.

29. Cape Fear River Watch's members have been, and will continue to be, directly and substantially injured because of Defendants' ongoing pollution. Their use and enjoyment of the water they consume, fish, swim, and paddle in is lessened by

8

Defendants' ongoing 1,4-dioxane contamination of these surface waters and the drinking water supplies.

30.     The Clean Water Act violations alleged herein have directly and substantially harmed Cape Fear River Watch's members' health, economic, and property interests, as well as their recreational and aesthetic enjoyment of the Cape Fear River and its tributaries. These members would use and enjoy these waters more if the violations alleged herein ceased.

31.     The interests that Cape Fear River Watch seeks to protect in this lawsuit are germane to its purposes and objectives. Although its members would have standing to sue in their own right, neither the claims asserted herein, nor any of the relief requested, require the participation of individual members in this lawsuit.

32.     These injuries will not be redressed except by an order from this Court requiring Defendants to cease or control their 1,4-dioxane discharges.

33.     Enforcement by this Court as to Cape Fear River Watch's claims asserted and relief sought in this Complaint, including injunctive relief to cease the violations and the imposition of civil penalties, would redress the injuries suffered by Cape Fear River Watch and its members. Because these injuries are caused by Asheboro's unlawful discharges into the Cape Fear River Basin and its failure to properly use its pretreatment authority, and StarPet's unlawful discharges into Asheboro's wastewater plant, they fall within the zone of interests protected by the Clean Water Act.

9

**Plaintiff Haw River Assembly and Its Members**

34.     Haw River Assembly is a "citizen" within the meaning of the Clean Water Act, 33 U.S.C. § 1365(a) and (g).

35.     Haw River Assembly is a North Carolina 501(c)(3) nonprofit organization dedicated to promoting environmental awareness, conservation, and pollution prevention, speaking as a voice for the Haw River in the public arena, and putting into people's hands the tools and knowledge they need to be effective guardians of the Haw River watershed. Haw River Assembly's principal place of business is located at 143 Bynum Church Road, Pittsboro, North Carolina 27312.

36.     Because there is currently no licensed Deep Riverkeeper program, Haw River Assembly and Cape Fear River Watch have an agreement to share responsibility for stewardship of the Deep River and advocate for its protection from pollution, including Defendants' 1,4-dioxane discharges. The Deep River is part of the Upper Cape Fear River Basin and adjoins the Haw River watershed, and Haw River Assembly has members throughout the region that use all three water bodies: the Deep River, the Haw River, and the Cape Fear River.

37.     Haw River Assembly advocates at the local, state, and federal levels on behalf of the Haw River and the people who use and rely on it. Haw River Assembly is a leading voice combating industrial chemical pollution, including 1,4-dioxane, across the entire state. Haw River Assembly began advocating against 1,4-dioxane pollution when it learned that the drinking water for Pittsboro, North Carolina, a town where many of its

10

members live, had for decades been contaminated with chemical pollution from municipal wastewater plants.

38.     Defendants' pollution directly harms Plaintiff Haw River Assembly because it has had to divert time, financial resources, and staff time to addressing Asheboro's 1,4-dioxane pollution—resources that could have instead been spent elsewhere to further Haw River Assembly's mission and member priorities. If this pollution were redressed, Haw River Assembly could return its focus to other water quality concerns throughout the watershed.

39.     Defendants' pollution also directly and substantially harms Haw River Assembly's members. Haw River Assembly has over 1,000 members, many of whom live in Pittsboro and Sanford, North Carolina. Alongside its members who drink, fish, play, and swim in the Haw River, Haw River Assembly has members who drink water from the Cape Fear River, and fish, paddle, and boat in and around the Deep and Cape Fear Rivers, downstream of Defendants' discharges.

40.     As discussed in more detail below, Defendants' discharges are contaminating municipal drinking water utilities that supply drinking water downstream of Asheboro's discharges, such as the city of Sanford. Sanford currently provides drinking water to communities in Goldston, Lee County, and parts of Chatham County.

41.     Furthermore, Sanford is expanding its drinking water utility services to provide water across the region. Over the next few years, many other areas in Chatham County as well as Holly Springs and Fuquay-Varina will begin receiving drinking water

11

from Sanford. Pittsboro, Holly Springs, Fuquay-Varina, and Chatham County have already signed interlocal agreements binding the cities to pay for the interconnection to Sanford's drinking water utility.

42. In total, after this expansion, Sanford alone will supply drinking water to at least 80,000 North Carolinians, including many Haw River Assembly members. Because Sanford (like other drinking water utilities) cannot remove 1,4-dioxane from drinking water, Defendants' pollution puts these drinking water users at risk.

43. Haw River Assembly thus has members who currently or will imminently rely on, use, and consume drinking water downstream of Asheboro's wastewater plant. Some of these members already have, or plan to, expend significant sums of money to obtain alternative sources of water or treat the water flowing into their home to avoid health impacts associated with drinking 1,4-dioxane laden water.

44. Haw River Assembly also has members who fish, swim, paddle, and/or play in the Deep River and Cape Fear River but have either decreased their frequency of doing so, or no longer find as much enjoyment in doing so as a result of their concerns about industrial pollution like 1,4-dioxane.

45. Haw River Assembly's members' health, economic, recreational, aesthetic, and property interests are thus injured by the unlawful discharges of each Defendant, and they will continue to be directly and substantially injured from Defendants' ongoing pollution. Their use and enjoyment of the water they consume, fish, swim, and paddle in is lessened by Defendants' ongoing 1,4-dioxane contamination of these surface waters

12

and drinking water supplies. Haw River Assembly's members would use and enjoy the Deep and Cape Fear Rivers more if the violations alleged herein ceased.

46.     The interests that Haw River Assembly seeks to protect in this lawsuit are germane to its purposes and objectives. Although its members would have standing to sue in their own right, neither the claims asserted herein, nor any of the relief requested, require the participation of individual members in this lawsuit.

47.     These injuries will not be redressed except by an order from this Court requiring Defendants to cease their 1,4-dioxane discharges.

48.     Enforcement by this Court as to Haw River Assembly's claims asserted and relief sought in this Complaint, including injunctive relief to cease the violations and the imposition of civil penalties, would provide redress for the injuries suffered by Haw River Assembly and its members. Because these injuries are caused by Asheboro's unauthorized discharges and its failure to properly use its pretreatment authority, and StarPet's unlawful discharges into Asheboro's wastewater plant, these injuries fall within the zone of interests protected by the Clean Water Act.

**Defendant City of Asheboro**

49.     Defendant city of Asheboro is a municipal corporation organized under the laws of the State of North Carolina.

50.     Defendant city of Asheboro is the owner and operator of the Asheboro Wastewater Treatment Plant, located at 1032 Bonkemeyer Drive in Asheboro, North Carolina (the "wastewater plant").

13

51.     Defendant city of Asheboro is a "person" within the meaning of 33 U.S.C. §§ 1365(a)(1) and 1362(5).

52.     The Asheboro Wastewater Treatment Plant is a "treatment works" within the meaning of 33 U.S.C. §§ 1362(26) and 1292(2).

**Defendants StarPet Inc. and Indorama Ventures USA, LLC**

53.     Defendant Indorama Ventures USA, LLC is a chemicals company.

54.     Defendants Indorama Ventures and its wholly-owned subsidiary, StarPet Inc., operate the StarPet PET manufacturing facility, located at 801 Pineview Road in Asheboro, North Carolina.

55.     Defendants Indorama Ventures USA, LLC and StarPet Inc. are "person[s]" within the meaning of 33 U.S.C. §§ 1365(a)(1) and 1362(5).

56.     All claims alleged against "StarPet" herein are asserted against both Defendant Indorama Ventures USA, LLC and Defendant StarPet Inc.

## LEGAL BACKGROUND

**Clean Water Act, 33 U.S.C. § 1251 et seq.**

57.     The Clean Water Act's purpose is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish that objective, Congress set the national goal that "the discharge of pollutants into navigable waters be eliminated." *Id.*

58.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" except in compliance with, among other

14

conditions, an NPDES permit issued by the EPA or an authorized state pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342.

59.    The North Carolina Department of Environmental Quality has had the authority to issue NPDES permits since 1975. Wastewater plant NPDES permits are administered by the Department's Division of Water Resources' NPDES Program.

60.    Each violation of an NPDES permit, and each discharge of a pollutant that is not authorized by a permit, is a violation of the Clean Water Act. *See* 33 U.S.C. §§ 1311(a), 1365(a)(1), (f); 40 C.F.R. § 122.41(a). Moreover, when an NPDES "permit holder discharges a pollutant that it did not disclose" to the permitting authority and which was not contemplated by the permitting authority at the time the permit was issued, "it violates the NPDES permit and the [Clean Water Act]." *Piney Run Pres. Ass'n v. Cnty. Comm'rs*, 268 F.3d 255, 268 (4th Cir. 2001).

61.    The Clean Water Act defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A).

62.    The Clean Water Act defines "pollutant" to include "solid waste, incinerator residue, sewage, garbage, sewage sludge, chemical wastes, biological materials . . . and industrial, municipal, and agricultural waste discharged into water." *Id.* § 1362(6).

63.    The Clean Water Act defines "point source" to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel,

tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged." *Id.* § 1362(14).

64.     A source need not be the original source of pollution to be considered a point source; it only needs to convey the pollution into navigable waters. *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105 (2004).

65.     The Clean Water Act defines "navigable waters" as "waters of the United States." 33 U.S.C. § 1362(7).

66.     Surface waters are "waters of the United States" if they are, among other things, "currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce," or are "relatively permanent, standing or continuously flowing" tributaries of such waters. 40 C.F.R. § 120.2(a).

67.     State law, N.C. Gen. Stat. § 143-212(6), defines protected surface waters as "any stream, river, brook, swamp, lake, sound, tidal estuary, bay, creek, reservoir, waterway, or other body or accumulation of water, whether surface or underground, public or private, or natural or artificial, that is contained in, flows through, or borders upon any portion of this State, including any portion of the Atlantic Ocean over which the State has jurisdiction."

68.     Similarly, Section 52.02 of Asheboro's sewer use ordinance defines "waters of the State" to mean "[a]ll streams, rivers, brooks, swamps, sounds, tidal estuaries, bays, creeks, lakes, waterways, reservoirs, and all other bodies or accumulations of water, surface or underground, natural or artificial, public or private,

16

which are contained within, flow through, or border upon the state or any portion thereof."

69.     Recognizing that not every discharger will release wastewater directly into rivers, creeks, or streams, the Clean Water Act includes a pretreatment program that governs the discharge of industrial wastewater to municipal wastewater treatment plants, or "Publicly Owned Treatment Works" (hereinafter, "wastewater plants"). *See* 33 U.S.C. § 1317(b), (d). These wastewater discharges into wastewater plants come from industrial facilities known as "Industrial Users" or "Significant Industrial Users," and such discharges require permits known as "industrial user permits."

70.     The pretreatment program imposes obligations on wastewater plants and the industrial users, *see* 40 C.F.R. § 403.1(b), and "assures the public that [industrial] dischargers cannot contravene the [Clean Water Act's] statutory objectives of eliminating or at least minimizing discharges of toxic and other pollutants simply by discharging indirectly through [municipal wastewater plants] rather than directly to receiving waters," 52 Fed. Reg. 1586, 1590 (Jan. 14, 1987). Indeed, "[p]retreatment standards are intended to prevent these problems from occurring by requiring non-domestic users of [wastewater plants] . . . to pretreat their wastes before discharging them to the [wastewater plant]." *Id.* at 1586.

71.     EPA has emphasized that "generally holding industrial users accountable for their discharges to the extent they cause [wastewater plant] noncompliance is supported by sound policy and the goals of the [Clean Water Act]." *Id.*

17

72.     Under Section 505(a)(1) of the Clean Water Act, any "citizen" may commence a civil action in federal court on their own behalf against any "person" who is alleged to be in violation of an "effluent standard or limitation" under the Act. 33 U.S.C. § 1365(a)(1).

73.     The Clean Water Act defines "citizen" to mean any "person or persons having an interest which is or may be adversely affected." *Id.* § 1365(g).

74.     The Clean Water Act defines "person" to include "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." *Id.* § 1362(5).

75.     The Clean Water Act defines "effluent limitation" to include an unauthorized discharge, 33 U.S.C. § 1365(f)(1), an NPDES permit or condition thereof, *id.* § 1365(f)(7), and a "prohibition, effluent standard or pretreatment standard[] under [33 U.S.C. § 1317]," *id.* § 1365(f)(4).

76.     The unauthorized discharge of any pollutant is an unlawful act under Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), as is noncompliance with an NPDES permit, *id.*; 40 C.F.R. § 122.41(a).

77.     Among other provisions of the Clean Water Act, citizen suits can be used to enforce the provisions of, and seek remedies for, (1) an unauthorized discharge in violation of Section 301 of the Act, 33 U.S.C. § 1311, (2) a failure to comply with a prohibition, effluent standard, or pretreatment standard under Section 307 of the Act, *id.*

18

§ 1317(b); and (3) a violation of a condition of a permit issued pursuant to Section 402 of the Act, *id*. § 1342, which includes NPDES permits. *See id*. § 1365(a)(1), (f).

78.     Any person who violates any of the above provisions is subject to daily civil penalties for each violation. *See* 33 U.S.C. § 1319(d); 40 C.F.R. § 122.41(a). Federal courts have jurisdiction to impose such penalties in citizen suits. 33 U.S.C. § 1365(a).

79.     Federal courts are authorized to issue injunctive relief under the citizen suit provision of the Clean Water Act. *See id*. § 1365(a).

80.     Federal courts are authorized to issue declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

81.     Federal courts may assess civil penalties against violators of up to $68,445 per day for each violation of the Clean Water Act that occurs after November 2, 2015, where penalties are assessed on or after January 8, 2025. 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

82.     In Clean Water Act suits, a court may award costs of litigation to the prevailing or substantially prevailing party, including attorney and expert witness fees. 33 U.S.C. § 1365(d).

## FACTUAL BACKGROUND

83.     The city of Asheboro operates a nine million gallon-per-day wastewater treatment plant ("wastewater plant") that releases wastewater into Haskett Creek, a class C water in the Cape Fear River Basin. Haskett Creek flows into a portion of the Deep River that is protected for aquatic life and recreation. Approximately 43.5 miles

19

downstream, the Deep River becomes a water supply and is designated as a drinking water source.

84.     Asheboro's wastewater plant receives domestic and industrial wastewater from at least 14 significant industrial users, including metal finishing and textile facilities, StarPet (a PET plastics manufacturer), and the landfill.

85.     Asheboro's wastewater plant is designed to treat water that has been used in homes or businesses, such as domestic sewage. It takes in wastewater from homes and businesses, processes it to remove certain conventional pollutants, and then releases that wastewater into rivers and other surface waters.

**Asheboro's wastewater plant is a leading source of toxic 1,4-dioxane.**

86.     Asheboro's wastewater contains 1,4-dioxane, a likely carcinogen.

87.     1,4-Dioxane is a clear, man-made chemical that is a byproduct of many industrial processes. The chemical is toxic to humans, causing liver and kidney damage at extraordinarily low levels.

88.     Recent federal assessments have determined that exposure to 1,4-dioxane in drinking water poses an unreasonable risk to human health. EPA has established a drinking water health advisory with an associated lifetime cancer risk of one-in-one-million at a concentration of 0.35 ppb. North Carolina has similarly determined that 1,4-dioxane is toxic and poses a cancer risk in drinking water at levels higher than 0.35 ppb.

89.     In 2014, researchers from North Carolina State University discovered elevated levels of 1,4-dioxane in the Cape Fear River Basin, and by 2015 the Department

20

confirmed three "hot spots" or sources of the ongoing contamination: the wastewater plants in Asheboro, Greensboro, and Reidsville.

90.     For at least a decade, Asheboro has remained a primary source of 1,4-dioxane in surface waters downstream of its wastewater plant.

91.     The Department determined that, in order to ensure downstream drinking water supplies do not contain 1,4-dioxane at levels exceeding 0.35 ppb (the one-in-one million cancer risk value), Asheboro would need to keep its pollution below 21.58 ppb on average. The Department informed Asheboro of this number by fall 2022 at the latest.

92.     But Asheboro's pollution routinely far exceeds this health protective level.

93.     From March 26, 2020 to present, Asheboro has discharged 1,4-dioxane into Haskett Creek at least 226 times. The city collects and analyzes a single sample (called a grab sample) per week from the wastewater plant's discharge. Asheboro's grab samples confirm that the city's 1,4-dioxane pollution has reached levels as high as 3,520 ppb and averaged 86 ppb.

94.     Since July 16, 2021, Asheboro has also collected a weekly composite sample of its effluent, which it provides to the Department for analysis. While the grab samples show 1,4-dioxane levels at a single point in time, composite samples show a weekly average concentration. Asheboro's composite samples have reached as high as 2,300 ppb and averaged 119 ppb.

95.     Indeed, since March 26, 2020, Asheboro discharged 1,4-dioxane above 21.58 ppb, the level the Department deemed protective of human health, at least 159

21

times. Because Asheboro has infrequently monitored for 1,4-dioxane over the past half-decade, it is likely—even probable—that the city has released 1,4-dioxane above that level on many more occasions.

**Asheboro's 1,4-dioxane pollution comes from StarPet and the landfill.**

96.     Upon information and belief, much of Asheboro's 1,4-dioxane pollution comes from StarPet, a significant industrial user. StarPet is a PET plastics manufacturer that produces 1,4-dioxane as a byproduct of its manufacturing process. StarPet and its predecessors have discharged wastewater to the Asheboro wastewater plant since at least 1997. StarPet is currently permitted to send up to 70,000 gallons per day of process and domestic wastewater to the city's wastewater plant—wastewater that often contains extraordinarily high levels of 1,4-dioxane.

97.     Asheboro discovered that StarPet was discharging high levels of 1,4-dioxane to its wastewater plant by 2015, and the city began regularly sampling StarPet's wastewater in November 2020.

98.     Since November 23, 2020 and the date of this Complaint, StarPet's wastewater has contained 1,4-dioxane at levels reaching as high as 375,000 ppb with an average concentration of 5,530 ppb, as depicted below:

| Table 1 | | | | | |
|---|---|---|---|---|---|
| **StarPet's 1,4-Dioxane Discharges: 1,4-Dioxane Concentration (ppb)** | | | | | |
| 11/23/2020 | 12/7/2020 | 12/21/2020 | 12/30/2020 | 1/7/2021 | 1/13/2021 |
| 69 | 16.3 | 46.7 | 23.5 | 35.8 | 66 |
| 1/21/2021 | 2/2/2021 | 2/10/2021 | 2/16/2021 | 3/10/2021 | 3/16/2021 |
| 29.9 | 16.2 | 186 | 337 | 12.5 | 32.5 |
| 3/25/2021 | 4/7/2021 | 4/15/2021 | 4/22/2021 | 4/28/2021 | 5/5/2021 |
| 432 | 32.2 | 13.5 | 32.3 | 13.7 | 25.1 |
| 5/13/2021 | 5/19/2021 | 5/24/2021 | 6/2/2021 | 6/9/2021 | 6/17/2021 |
| 15.7 | 26 | 62.8 | 14.3 | 42 | 568 |
| 6/22/2021 | 6/29/2021 | 7/8/2021 | 7/16/2021 | 7/23/2021 | 7/30/2021 |
| 261 | 94.9 | 307 | 182 | 118 | 208 |
| 8/6/2021 | 8/13/2021 | 8/20/2021 | 8/27/2021 | 9/1/2021 | 9/17/2021 |
| 198 | 279 | 106 | 128 | 74.2 | 212 |
| 10/1/2021 | 10/15/2021 | 10/21/2021 | 10/29/2021 | 11/2/2021 | 11/5/2021 |
| 1,220 | 15,900 | 18,300 | 76,200 | 3.26 | 47.9 |
| 11/12/2021 | 11/19/2021 | 11/22/2021 | 12/3/2021 | 12/10/2021 | 12/17/2021 |
| 17.2 | 8.32 | 12.8 | 38 | 14.2 | <10 |
| 12/21/2021 | 1/7/2022 | 1/14/2022 | 1/20/2022 | 1/28/2022 | 2/4/2022 |
| 9.46 | 25.4 | 32 | 679 | 29.5 | 32 |
| 2/11/2022 | 2/18/2022 | 2/25/2022 | 3/4/2022 | 3/11/2022 | 3/18/2022 |
| 32 | 79.8 | 18 | 375,000 | 85 | 27.6 |
| 3/25/2022 | 4/1/2022 | 4/8/2022 | 4/12/2022 | 4/22/2022 | 4/29/2022 |
| 38.2 | 13 | 13.4 | 27.5 | 12.7 | 26.5 |
| 5/6/2022 | 5/13/2022 | 5/20/2022 | 5/27/2022 | 6/3/2022 | 6/9/2022 |
| 18.5 | 5.38 | 111 | 18.6 | 3.78 | 28.5 |
| 6/17/2022 | 6/24/2022 | 7/1/2022 | 7/8/2022 | 7/15/2022 | 7/22/2022 |
| 77.7 | 16 | 7.44 | 9.84 | 67.7 | 143 |
| 7/29/2022 | 8/5/2022 | 8/12/2022 | 8/19/2022 | 8/26/2022 | 9/2/2022 |
| 16.4 | 13.4 | 356 | 255 | 132 | 31.8 |
| 9/9/2022 | 9/16/2022 | 9/23/2022 | 9/30/2022 | 10/7/2022 | 10/14/2022 |
| 19.6 | 99 | 75.4 | 716 | 44.5 | 2.74 |
| 10/21/2022 | 10/28/2022 | 11/4/2022 | 11/10/2022 | 11/18/2022 | 12/2/2022 |
| 288 | 30.5 | 121 | 14.8 | 42.2 | 190 |
| 12/9/2022 | 12/16/2022 | 1/6/2023 | 1/13/2023 | 1/20/2023 | 1/23/2023 |
| 13.5 | 160 | 165 | 220,000 | 329,000 | 107 |

23

| Table 1 | | | | | |
|---|---|---|---|---|---|
| StarPet's 1,4-Dioxane Discharges: 1,4-Dioxane Concentration (ppb) | | | | | |
| 1/27/2023 | 2/3/2023 | 2/10/2023 | 2/17/2023 | 2/24/2023 | 3/3/2023 |
| 63.7 | 54.9 | 155 | 15.8 | 49.1 | 31 |
| 3/10/2023 | 3/17/2023 | 3/23/2023 | 3/31/2023 | 4/5/2023 | 4/14/2023 |
| 127 | 198 | 166 | 254 | 13.6 | 4.56 |
| 4/21/2023 | 4/28/2023 | 5/5/2023 | 5/12/2023 | 5/19/2023 | 5/23/2023 |
| 2.96 | 9.18 | 6.46 | 11.3 | 3.42 | 3.78 |
| 6/2/2023 | 6/9/2023 | 6/16/2023 | 6/23/2023 | 6/30/2023 | 7/7/2023 |
| 13.4 | 6.26 | 19.5 | 6.92 | 6.96 | 9.22 |
| 7/14/2023 | 7/21/2023 | 7/28/2023 | 8/4/2023 | 8/11/2023 | 8/18/2023 |
| 168 | 16.2 | 226 | 72.5 | 8.7 | 11.7 |
| 8/25/2023 | 9/1/2023 | 9/8/2023 | 9/15/2023 | 9/22/2023 | 9/29/2023 |
| 158 | 6.58 | 8.3 | 44.3 | 240 | 79.5 |
| 10/6/2023 | 10/13/2023 | 10/20/2023 | 10/27/2023 | 11/3/2023 | 11/9/2023 |
| 28 | 12.3 | 154 | 144 | 47.7 | 19.7 |
| 11/17/2023 | 12/1/2023 | 12/8/2023 | 12/15/2023 | 1/5/2024 | 1/12/2024 |
| 9.58 | 33.5 | 31.6 | 742 | 29.2 | 326 |
| 1/19/2024 | 1/26/2024 | 2/2/2024 | 2/9/2024 | 2/16/2024 | 2/23/2024 |
| 397 | 34.5 | 211 | 24.4 | 374 | 12.3 |
| 3/1/2024 | 3/7/2024 | 3/15/2024 | 3/21/2024 | 3/28/2024 | 4/5/2024 |
| 664 | 55.3 | 40.6 | 353 | 311 | 46.3 |
| 4/12/2024 | 4/19/2024 | 4/26/2024 | 5/2/2024 | 5/10/2024 | 5/17/2024 |
| 12.2 | 32.9 | 51.3 | 12.5 | 202 | 26.7 |
| 5/24/2024 | 5/31/2024 | 6/7/2024 | 6/14/2024 | 6/21/2024 | 6/28/2024 |
| 29.9 | 15.8 | 110 | 147 | 56.6 | 19.8 |
| 7/3/2024 | 7/12/2024 | 7/19/2024 | 7/26/2024 | 8/2/2024 | 8/7/2024 |
| 68.1 | 66.3 | 11.3 | 16.3 | 39.1 | 91.5 |
| 8/16/2024 | 8/23/2024 | 8/30/2024 | 9/6/2024 | 9/13/2024 | 9/20/2024 |
| 26.7 | 21.8 | 291 | 60.8 | 87.6 | 17.7 |
| 9/27/2024 | 10/4/2024 | 11/15/2024 | 12/13/2024 | 1/10/2025 | 1/31/2025 |
| 24.4 | 27.5 | 43.9 | 58.2 | 257 | 143 |
| 2/14/2025 | 3/14/2025 | 4/17/2025 | 5/2/2025 | | |
| 58 | 211 | 24,900 | 79.7 | | |

24

99.     In November 2020, StarPet completed the installation of a pre-built, Koch Modular treatment system ("pretreatment system"). The pretreatment system is comprised of a stripper column, reboiler, condenser, heat exchanger, thermal oxidizer, and effluent pH adjustment, and was designed to remove 1,4-dioxane to a level of 1,000 ppb. That month, Asheboro updated StarPet's industrial user permit to authorize StarPet to use this pretreatment system.

100.    But StarPet's pretreatment system frequently malfunctions or is improperly operated. Since November 2020, StarPet's system has shut down or been intentionally taken offline at least six times, half of which have occurred in the past several months.

101.    Each time StarPet's pretreatment system malfunctions or is taken offline, the company sends extraordinarily high levels of 1,4-dioxane to the city's wastewater plant. Because Asheboro's wastewater plant does not effectively remove 1,4-dioxane, StarPet's 1,4-dioxane pollution causes the city to discharge high levels of the toxic chemical into Haskett Creek, upstream of numerous drinking water supplies.

102.    While likely not exhaustive, the below list summarizes the known dates when StarPet's pretreatment system malfunctioned or was taken offline and the high levels of pollution that ensued:

   a.   October 2021: Asheboro notified StarPet that an extremely high concentration of 1,4-dioxane (15,900 ppb) was measured in StarPet's wastewater on October 15, 2021. StarPet later determined that the heat exchanger in its 1,4-dioxane pretreatment system had fouled, and the

industry removed its 1,4-dioxane pretreatment system from service for cleaning and repairs on October 29th. As a result of this incident, Asheboro's wastewater plant discharged elevated levels of 1,4-dioxane in its effluent throughout October 2021, including at 548 ppb on October 21st and 636 ppb on October 29th.

b. March 2022: On March 3, 2022, StarPet shut down part of its manufacturing system and failed to route its industrial wastewater to its 1,4-dioxane pretreatment system. On March 4th, StarPet sent untreated wastewater containing 375,000 ppb of 1,4-dioxane to the Asheboro wastewater plant. As a result of this incident, composite data collected from Asheboro's discharge between March 7th through March 11th showed that Asheboro released 1,4-dioxane at levels averaging 600 ppb.

c. July 2022: StarPet shut down its 1,4-dioxane pretreatment system for maintenance on July 20, 2022 and informed Asheboro that it was doing so. On July 22nd, Asheboro discharged 1,4-dioxane at 449 ppb and a composite sample collected between July 18th to July 22nd showed that Asheboro discharged 1,4-dioxane at an average level of 670 ppb during this time.

d. January 2023: On January 13, 2023, StarPet released 1,4-dioxane at levels reaching 220,000 ppb due to its 1,4-dioxane pretreatment system clogging. As a result of this incident, Asheboro's wastewater contained elevated

26

levels of 1,4-dioxane throughout January, including at 302 ppb on January 13th and 1,130 ppb on January 20th. Asheboro's composite sample for this period showed it released an average of 1,500 ppb of 1,4-dioxane from January 17th to January 20th.

e. <u>Mid-October 2024</u>: StarPet shut down its 1,4-dioxane pretreatment system for repairs on October 14, 2024 and informed Asheboro that it was doing so. StarPet did not hold back its wastewater during the system's downtime and released an estimated 27,143 gallons of untreated 1,4-dioxane laden wastewater to Asheboro's wastewater plant. Asheboro decreased its frequency of sampling StarPet's wastewater in October, resulting in scarce information on the pollution flowing from StarPet during this time. Nevertheless, the data that is available shows that as a result of this incident, Asheboro's 1,4-dioxane composite sample between October 14th and October 18th averaged 570 ppb.

f. <u>Late October 2024</u>: On October 29, 2024, Asheboro notified StarPet that Asheboro's wastewater plant was experiencing an odor and inhibition of its nitrification microorganisms. Upon investigation, StarPet discovered a vessel leaking heat transfer material at the manufacturer's facility. While StarPet ultimately stopped the leak on October 30th, Asheboro's composite sample, collected from October 28th through November 1st, measured 540 ppb of 1,4-dioxane.

27

g.  December 2024: On December 2, 2024, StarPet informed Asheboro that StarPet would need to shut down its 1,4-dioxane pretreatment system for maintenance, resulting in the release of untreated and "high dioxane concentrated" wastewater to Asheboro's treatment plant. Because Asheboro had by this point stopped sampling StarPet's wastewater weekly, StarPet's data neither confirms nor denies whether StarPet discharged untreated wastewater to Asheboro's wastewater plant during this time. Asheboro's data, however, shows that on December 6th, Asheboro released 1,4-dioxane at 813 ppb. The composite sample of 1,4-dioxane collected between December 2nd to December 6th averaged 510 ppb.

h.  January 2025: StarPet informed Asheboro that it again intended to shut down its 1,4-dioxane pretreatment system on January 16, 2025 to perform maintenance and repairs. Upon information and belief, StarPet's pretreatment system was shut down on January 16th and remained offline until January 28th; meanwhile, its manufacturing—and 1,4-dioxane pollution—continued. As a result, Asheboro discharged 1,4-dioxane at 3,520 ppb on January 24th and 440 ppb on January 31st. Asheboro's 1,4-dioxane composite samples measured at 2,300 ppb from January 20th to January 24th and 1,200 ppb from January 27th to January 31st. This shutdown resulted in more than just 1,4-dioxane issues—StarPet also leaked heat transfer material, causing Asheboro to exceed its 2012 NPDES

28

permit limits for ammonia-nitrogen for the week of January 26th to January 31st and for the month of January.

103. On April 17, 2025, StarPet released wastewater with a 1,4-dioxane concentration of 24,900 ppb, causing Asheboro to discharge the chemical at 826 ppb on April 25th. Neither Asheboro nor StarPet have disclosed the reason for the industry's high levels in this instance.[2]

104. StarPet is aware that its pretreatment system malfunctions regularly. The company has, since 2021, internally discussed installing a holding tank to retain untreated wastewater for when its pretreatment system fails. But as of the time of this Complaint, upon information and belief, no holding tank has been installed. No plans for installation have been made publicly available.

105. As evidenced by the fact that the company (1) still manufactures PET plastics, a process which is known to generate 1,4-dioxane; (2) has not implemented additional pretreatment technology or addressed the recurring problems with its existing pretreatment system; and (3) continues to send wastewater to Asheboro; and Asheboro continues to discharge 1,4-dioxane into Haskett Creek, StarPet's 1,4-dioxane pollution is ongoing as of the time of this Complaint.

106. Asheboro also receives 1,4-dioxane from Great Oak Landfill, and has known for years that the landfill's leachate is a source of 1,4-dioxane at its wastewater

---

[2] Conservation Groups, through counsel, submitted a public records request to Asheboro seeking information of the elevated April 2025 discharges, but as of the date of this Complaint, Asheboro has not produced records explaining the occurrence.

plant. Leachate is the highly-concentrated wastewater produced when liquid, such as rainfall, percolates through landfill waste, thereby becoming contaminated. Leachate is collected within a liner system under the landfill's waste, and pumped out into a holding tank before being sent—untreated—to Asheboro's wastewater plant. The landfill is currently permitted to send, on average, up to 42,000 gallons per day of leachate to Asheboro's wastewater plant.

107. Upon information and belief, the landfill has higher levels of 1,4-dioxane in its leachate than *any other landfill in the state*, which may be in part because the landfill accepts sludge from Asheboro's wastewater plant for disposal, and this sludge is likely highly contaminated with 1,4-dioxane.

108. Between April 2021 and August 2022, Asheboro collected 1,4-dioxane samples of the landfill's leachate. In addition to the sampling conducted by Asheboro, the landfill annually samples its leachate for 1,4-dioxane. The following table presents publicly available data on 1,4-dioxane concentrations in the landfill's leachate.

| Table 2 | |
|---|---|
| The Great Oak Landfill's 1,4-Dioxane Pollution | |
| Date | 1,4-Dioxane Concentration (ppb)[3] |
| 10/6/2020 | 950* |
| 4/9/2021 | 66,300 |
| 4/15/2021 | 49,100 |
| 4/22/2021 | 37,100 |
| 4/28/2021 | 34,700 |
| 5/4/2021 | 33,700 |
| 5/12/2021 | 28,600 |
| 5/18/2021 | 30,700 |

---

[3] The landfill's annual sampling results are identified with an asterisk.

| Table 2 | |
|---|---|
| **The Great Oak Landfill's 1,4-Dioxane Pollution** | |
| **Date** | **1,4-Dioxane Concentration (ppb)[3]** |
| 5/24/2021 | 31,600 |
| 6/1/2021 | 26,000 |
| 6/8/2021 | 29,100 |
| 6/16/2021 | 26,900 |
| 6/21/2021 | 28,800 |
| 6/28/2021 | 39,000 |
| 7/8/2021 | 29,100 |
| 7/22/2021 | 31,600 |
| 8/5/2021 | 45,000 |
| 9/23/2021 | 18,000 |
| 10/27/2021 | 43,200 |
| 11/9/2021 | 49,600 |
| 12/1/2021 | 47,300 |
| 12/9/2021 | 47,200* |
| 12/16/2021 | 43,400 |
| 1/5/2022 | 44,900 |
| 3/3/2022 | 69,100 |
| 3/16/2022 | 67,300 |
| 4/6/2022 | 62,600 |
| 5/26/2022 | 62,900 |
| 7/5/2022 | 78,800 |
| 8/25/2022 | 61,100 |
| 10/11/2022 | 14,200* |
| 10/30/2023 | 51,900* |
| 10/1/2024 | 13,000* |

109. Upon information and belief, over the past several years, the landfill's once-a-year sampling has been the only monitoring of the landfill leachate's 1,4-dioxane levels. The landfill's pollution could therefore be higher than previously documented.[4]

---

[4] The North Carolina Public Records Act requires subdivisions of North Carolina government—such as municipalities like Asheboro—to provide requested records in their custody. If further sampling *has* been conducted and is in Defendant Asheboro's custody,

110.    The landfill has not installed treatment technology to remove 1,4-dioxane from its leachate. Asheboro has similarly not required the landfill to install—or even evaluate the possibility of installing—any such pretreatment technology.

111.    The landfill continues to send leachate to Asheboro's wastewater plant without any treatment for 1,4-dioxane, and Asheboro continues to discharge elevated levels of 1,4-dioxane, which further indicates that the landfill's 1,4-dioxane pollution is ongoing.

112.    There are effective treatment options for industrial users like StarPet and the landfill that—when operated correctly and continuously—dramatically reduce or eliminate 1,4-dioxane pollution at the industrial source. For example, advanced oxidation processes coupled with ultraviolet light have, for decades, been used to remove 1,4-dioxane from industrial wastewater, landfill leachate, municipal wastewater, and drinking water. The same is true for advanced oxidation coupled with ozone treatment. Separation technologies like reverse osmosis can also effectively remove 1,4-dioxane from industrial wastewater.

**Defendants' 1,4-dioxane contaminates downstream drinking water supplies.**

113.    1,4-Dioxane does not break down in the environment, is highly mobile, and cannot be removed by conventional water treatment technologies. This means that, if

---

it has not been produced in response to a public records request that specifically sought this information, nor has Asheboro explained any reason why the requested records could be exempted from disclosure.

released upstream, the chemical can and does pollute downstream drinking water supplies.

114. Nearly ten years ago, the Cape Fear River Basin was found to have "some of the highest measured concentrations of 1,4-dioxane in finished drinking water" in North Carolina and the United States. A recent report prepared by the Department confirms that North Carolinians in the Cape Fear River Basin continue to suffer from up to twice the levels of 1,4-dioxane in their drinking water than the national average.

115. Asheboro's 1,4-dioxane pollution is a substantial contributor to this drinking water crisis, both because of its severity and the number of drinking water users downstream. Nearly 900,000 North Carolinians drink water (or are contracted to soon begin receiving drinking water) sourced downstream of Asheboro's ongoing discharges.

116. Traveling through Haskett Creek, the Deep River, and then the Cape Fear, Asheboro's 1,4-dioxane pollution flows down the Cape Fear River basin into surface water bodies used as public drinking water supply intakes for the city of Sanford, Harnett Regional Water, Dunn, Fayetteville, Bladen Bluffs, Brunswick County, Pender County, and Wilmington, as depicted in the image below.



**Drinking Water for Nearly 900,000 People Threatened by Asheboro's 1,4-Dioxane Pollution**

117.    Once discharged, 1,4-dioxane is typically not removed by downstream drinking water utilities' treatment systems. As a result, this contamination has led to elevated levels of 1,4-dioxane in *finished* drinking water downstream.

118.    In Sanford, finished drinking water in 2023 averaged 0.58 ppb, exceeding the safe level of 0.35 ppb. In 2024, the city experienced levels as high as 6 ppb. Most recently, in March and April of 2025, finished water measured 2.2 ppb and 1.1 ppb, respectively.

119. Over a decade ago, 1,4-dioxane was detected in Harnett Regional Water's finished tap water at 3.45 ppb (in 2014) and 3.65 ppb (in 2015), and nothing indicates that levels have since decreased.

120. Fayetteville, North Carolina also routinely detects 1,4-dioxane at its drinking water intake point. In November 2024, the Fayetteville Public Works Commission reported that the 1,4-dioxane level at the drinking water intake location for the city's Hoffer Water Treatment Facility was 11.9 ppb—more than 30 times higher than the cancer risk value of 0.35 ppb.

121. Farther downstream, the Cape Fear Public Utilities Authority ("CFPUA"), the primary drinking water provider for the city of Wilmington, also regularly detects 1,4-dioxane in its drinking water supply above the cancer risk value. On at least 52 occasions since January 2019—representing approximately 40 percent of samples taken during that period—CFPUA's finished drinking water at its Sweeney Water Treatment Plant has exceeded the cancer risk value of 0.35 ppb. So far in 2025, every documented finished water sample has contained 1,4-dioxane, and four samples exceeded the cancer risk value.

122. Other communities downstream of Asheboro also suffer from continued 1,4-dioxane pollution at their drinking water intakes, including, but not limited to, Brunswick County (averaging 1.55 ppb, and ranging from 0.87 ppb–2.68 ppb), Bladen Bluffs (averaging 2.32 ppb, and ranging from 1.02 ppb–3.17 ppb), and Pender County (averaging 2.08 ppb, and ranging from 0.93 ppb–3.1 ppb).

35

123.    Most of the cities downstream of Asheboro's discharges are not routinely sampling their drinking water for 1,4-dioxane, so it is likely that the levels of 1,4-dioxane in drinking water exceed the one-in-one million cancer levels more frequently than these sampling results capture.

124.    Once 1,4-dioxane reaches drinking water sources, it is exceedingly expensive for drinking water utilities to remove the chemical. Treatment at drinking water utilities would require the communities already suffering from the health effects of drinking contaminated water to front the bill for expensive treatment systems.

**Asheboro's NPDES permit does not allow the city to discharge 1,4-dioxane.**

125.    Asheboro is currently authorized to release wastewater under NPDES permit number NC0026123, issued on June 27, 2012. Asheboro is required to comply with the conditions set forth in Parts I through IV of its NPDES permit, including all effluent limitations, monitoring requirements, and standard conditions applicable to municipal wastewater plants. A copy of Asheboro's NPDES permit (detailing effluent limitations and monitoring requirements) and the standard conditions (Parts II–IV of Asheboro's permit) are provided as Attachments 1 and 2 of Exhibit A.

126.    Asheboro did not disclose that it discharged 1,4-dioxane when applying for its 2012 NPDES permit or any prior permit application or request for modification. The Department did not contemplate that the wastewater plant would be dumping this chemical into the Cape Fear River Basin.

36

127. In August 2023, the Department attempted to issue Asheboro a renewed NPDES permit (the "2023 NPDES permit") that would have addressed the city's 1,4-dioxane pollution, but the city challenged that permit, and North Carolina's administrative law court determined it never went into effect. *See* Attachment 4 of Exhibit A. In January 2025, a North Carolina Wake County Superior Court clarified that the 2012 NPDES permit "is administratively continued and shall remain in full force and effect." *See* Attachment 5 of Exhibit A. As a result, the 2012 NPDES permit governs Asheboro's discharges for all times relevant to this Complaint.

128. Asheboro's NPDES permit authorizes the city to discharge wastewater from Outfall 001 into Haskett Creek "in accordance with effluent limitations, monitoring requirements, and other conditions set forth in Parts I, II, III, and IV" of the permit. *See* Attachment 1 of Exhibit A. The permit goes on to reiterate that "the exclusive authority to operate and discharge from this facility arises under the permit conditions, requirements, terms, and provisions described herein."

129. The permit prescribes a number of effluent limitations and monitoring requirements, setting out which pollutants may be discharged, and in what amounts. None of these effluent limitations or conditions allow for the discharge of 1,4-dioxane.

130. As required by federal law, like all other NPDES permits, Asheboro's NPDES permit also includes a series of standard conditions. Among other requirements, the NPDES permit includes a "Duty to Comply," which requires Asheboro to "comply

37

with all conditions of this permit," and notes that "[a]ny permit noncompliance

constitutes a violation of the [Clean Water Act] and is grounds for enforcement action."

131.    Asheboro's NPDES permit also makes clear that permittees cannot violate

the Clean Water Act's prohibition on unauthorized discharges, noting that permit holders

are subject to penalties for noncompliance with Section 301, 33 U.S.C. § 1311.

132.    Asheboro's NPDES permit imposes a "Duty to Mitigate," which requires

the City to "take all reasonable steps to minimize or prevent any discharge . . . in

violation of this permit with a reasonable likelihood of adversely affecting human health

or the environment."

133.    Asheboro's NPDES permit also clearly states that "[i]t shall not be a

defense for a Permittee . . . that it would have been necessary to halt or reduce the

permitted activity in order to maintain compliance with the condition[s] of this permit."

**Asheboro is required to use its Pretreatment Program to control 1,4-dioxane, but is failing to do so.**

134.    As discussed above, Asheboro receives wastewater from commercial and

domestic sources, as well as from at least 14 significant industrial users—customers who

pay the city to send their industrial wastewater to the city's wastewater plant for disposal.

*See* 40 C.F.R. § 403.3(v)(1) (defining Significant Industrial User).

135.    Because Asheboro accepts industrial wastewater, federal regulations, 40

C.F.R. § 403.5(c)(1), and Part IV(C)(2) of Asheboro's NPDES permit require the city to

"develop and enforce" a Pretreatment Program to control pollution from its industrial

users in a way that complies with state and federal law. Part IV(C)(2) includes the

38

requirement that Asheboro "implement the prohibition against the introduction of pollutants or discharges into the waste treatment system or waste collection system which cause or contribute to Pass Through . . ." as defined in federal and state law, 40 C.F.R. § 403.3(p) and 15A N.C. Admin. Code 02H .0903(23). *See also* 40 C.F.R. § 403.5(c)(1).

136. In addition, Asheboro's permit states it must require industrial users "to meet Federal Pretreatment Standards developed under Section 307(b) of the [Clean Water] Act." To ensure these pretreatment laws are followed, Asheboro is required by Part IV(C)(2)(c) of its NPDES permit to "investigate the source of all discharges" to its wastewater plant and in Part IV(D)(5) of its NPDES permit to establish in industrial user permits "limitations, sampling protocols, reporting requirements, appropriate standard and special conditions, and compliance schedules as necessary." *See also* 40 C.F.R. § 403.8(f).

137. Asheboro adopted a sewer use ordinance that "enables the city to comply with all applicable state and federal laws, including the Clean Water Act (33 U.S.C. § 1251 et seq.) and the General Pretreatment Regulations (40 CFR Part 403)." Asheboro, N.C., Code of Ordinances § 52.01(A). Asheboro's sewer use ordinance prohibits industrial users from causing Pass Through and requires the city to take actions to ensure Pass Through does not occur. Asheboro's sewer use ordinance also requires that industrial users maintain adequate treatment technology to ensure they do not cause or contribute to unlawful Pass Through.

39

138.     As part of its federal, state, and local pretreatment obligations, Asheboro has issued industrial user permits to its significant industrial users, including StarPet and the landfill.

139.     The most recent version of StarPet's industrial user permit (Industrial User Permit Number 2228) was issued on July 30, 2022. StarPet's industrial user permit authorizes the company to use its pretreatment system, but does not contain limits or conditions addressing 1,4-dioxane discharges.

140.     The landfill's industrial user permit (Industrial User Permit Number 4953) was most recently issued on June 22, 2021. Like StarPet's, the landfill's industrial user permit does not contain limits or conditions that would address its 1,4-dioxane pollution.

141.     While no specific 1,4-dioxane limits exist, the industrial users have duties in their permits that they must follow. The industrial user permits issued to these facilities provide that each may discharge to Asheboro's wastewater plant only "in accordance with effluent limitations, monitoring requirements, and all other conditions set forth in Parts I, II, and III" of the industrial user permits.

142.     The industrial user permits require industrial users to comply with federal pretreatment regulations. In addition, "[p]arameters not limited in [the industrial user permits] shall be discharged in accordance with the city of Asheboro Sewer Use Ordinance."

143.     StarPet's industrial user permit explicitly requires it to "take reasonable steps to minimize or prevent any discharge in violation of this permit which has a

40

reasonable likelihood of adversely affecting human health, the [Asheboro wastewater plant], the waters receiving [Asheboro's] discharge, or the environment."

144.    StarPet shall "at all times maintain good working order and operate as efficiently as possible, all control facilities or systems installed or used by the permittee to achieve compliance with the terms and conditions of this permit." Bypassing the treatment systems is prohibited except when compliant with federal law.

145.    And it is not a defense for StarPet if it "would have been necessary to halt or reduce the permitted activity to maintain compliance with the conditions of [StarPet's industrial user] permit."

146.    StarPet's industrial user permit makes clear that noncompliance with the permit's terms constitutes noncompliance with Asheboro's sewer use ordinance and could give rise to enforcement actions.

147.    Collectively, these laws, regulations, and permit conditions make clear that both StarPet and Asheboro have the obligation to control their 1,4-dioxane pollution under the pretreatment program.

**Rather than use its authority to control 1,4-dioxane pollution, Asheboro has fought the Department's attempts to control the toxic chemical.**

148.    In 2014, soon after the Department learned of the 1,4-dioxane contamination in the Cape Fear River Basin, it launched an investigation with the hope that it could control the most significant sources of the toxic chemical.

149.    In October 2014, the Department began a comprehensive screening study throughout the basin, and by May 2015, it had identified the cities of Asheboro,

41

Greensboro, and Reidsville as 1,4-dioxane "hot spots." Over the next several years, the Department tried to work with the three cities to control their pollution. The Department requested that Asheboro collect routine 1,4-dioxane samples and asked the city to prepare a Corrective Action Plan detailing how it would control the ongoing toxic chemical pollution. Asheboro collected samples and submitted a plan, but its toxic chemical discharges continued, making clear that the city would not voluntarily abate its pollution.

150.    Once voluntary reduction measures were deemed ineffective, the Department tried to use stronger regulatory measures to address Asheboro's 1,4-dioxane pollution.

151.    To regulate 1,4-dioxane, the Department had previously relied on the narrative toxic substances standard, 15A N.C. Admin. Code 02B .0208, which serves to protect drinking water sources from cancer-causing chemicals and other harmful pollutants. The agency had lawfully used that authority to set pollution limits in at least one NPDES permit and to issue violations. But because some polluters—including Asheboro—still refused to comply with the narrative standard, the Department decided to adopt numeric water quality standards for 1,4-dioxane. While they were not strictly necessary given the existing narrative toxic substances standard, the Department hoped that numeric water quality standards could provide additional clarity about the safe level of 1,4-dioxane for the public, as well as for regulated industries and wastewater treatment plants.

152.    The Department first tried to adopt numeric water quality standards for 1,4-dioxane in 2020. The Department relied on the state's already-approved narrative toxic substances standard for the rulemaking. Based on federal health data and the formula in the narrative toxic substances standard, the Department determined that concentrations of 1,4-dioxane should not exceed 0.35 ppb in waterbodies used as drinking water sources, and 80 ppb in all other waterbodies.

153.    The Environmental Management Commission approved the Department's standards and the Office of State Budget Management approved the agency's regulatory impact analysis (a mandatory component of any state rulemaking). The last step of the rulemaking process in North Carolina is to go before the Rules Review Commission specifically to review the administrative aspects of the rule; the Rules Review Commission is prohibited from objecting to a rule because it disagrees with its substance. *See* N.C. Gen. Stat. § 150B-21.8(b) (limiting the scope of the Rules Review Commission's review to the standards in North Carolina's Administrative Procedure Act); N.C. Gen. Stat. § 150B-21.9(a) (describing the criteria the Rules Review Commission may consider when reviewing a rule).

154.    During the Rules Review Commission's review of the rules, municipal 1,4-dioxane polluters objected to the 1,4-dioxane standards, claiming that they would be too expensive to comply with. Despite a thorough regulatory impact analysis having already occurred (and having been certified by the Office of State Budget Management), the

43

Rules Review Commission sided with the municipal polluters and unlawfully blocked the standards from going into place.[5]

155.   In March 2024, the Department tried again to adopt numeric 1,4-dioxane water quality standards. This time, the Department proposed 1,4-dioxane water quality standards to the Environmental Management Commission as a part of a routine update to water quality standards (in a process known as the Triennial Review).

156.   On March 8, 2024—days before the Department was scheduled to present these proposed rules to the Environmental Management Commission's Water Quality Committee—the cities of Asheboro, Greensboro, and Reidsville sent a letter urging the Committee to block the proposal. In their letter, the cities made misleading arguments about how adopting numeric water quality standards for 1,4-dioxane would cost the cities "extraordinary" amounts of money. Citing the cities' concerns, the commissioners ultimately cut the Department's 1,4-dioxane water quality standards from the Department's rulemaking.

157.   As the Department's rulemaking proposals were offered and blocked, polluters like Asheboro continued to release toxic 1,4-dioxane into rivers across the state.

158.   In an attempt to control this pollution, the Department returned to its existing authority under the narrative toxic substances standard, and on December 6,

_____

[5] The Environmental Management Commission originally challenged the Rules Review Commission's overreach. Shortly after that lawsuit was filed, however, the North Carolina legislature changed the law on who appoints commissioners to the Environmental Management Commission—and the new members voted to dismiss the lawsuit.

44

2022, issued a draft NPDES permit to the city of Asheboro with 1,4-dioxane limits based on that standard. The draft permit set a monthly 1,4-dioxane effluent limit of 21.58 ppb, which was calculated to ensure that the one-in-one million cancer risk level for 1,4-dioxane (0.35 ppb) would not be exceeded at the nearest downstream drinking water supply. The permit also set a daily maximum 1,4-dioxane limit of 49.4 ppb.

159.    At first, Asheboro submitted public comments on the draft permit that did not oppose the 1,4-dioxane limits. Asheboro also reached out to its industrial users—including StarPet and the landfill—and informed them that upon issuance of the final permit, the industrial users would have to take steps to reduce the levels of 1,4-dioxane in their discharges to the wastewater plant.

160.    Later in the public comment period for the draft NPDES permit, however, the city seemed to change its stance and joined the city of Greensboro in a letter opposing the 1,4-dioxane effluent limits.

161.    The NPDES permit was finalized on August 21, 2023. The 2023 NPDES permit included a monthly average limit of 21.58 ppb for 1,4-dioxane and, to afford the city flexibility, a five-year compliance schedule so the city could work with its industrial users to control their pollution.

162.    But due to Asheboro's multi-forum efforts to avoid 1,4-dioxane regulation, the 2023 NPDES permit never actually went into effect.

163.    On September 19, 2023, Asheboro challenged the 2023 NPDES permit in North Carolina's Office of Administrative Hearings. After proceeding with the litigation

45

for a few months, the city dismissed the case, only to refile it on March 8, 2024.

Asheboro argued that before issuing an NPDES permit with effluent limits for 1,4-dioxane, the Department must instead go through formal rulemaking to adopt numeric water quality standards.

164. On the same day it filed its lawsuit, it sent a letter to the Environmental Management Commission (*see* Paragraph 160 above) urging it to block *the exact rulemaking* its lawsuit claimed was necessary.

165. The administrative court ultimately ruled in the city's favor, holding that the Department did not have authority to set limits for 1,4-dioxane without an associated numeric water quality standard.[6]

166. In the opinion, the administrative court purported to change Asheboro's 2023 NPDES permit, striking the 1,4-dioxane limits from the permit without sending it back to the Department for revision and public comment, as required by the agreement

---

[6] This conclusion, of course, runs contrary to federal regulations and U.S. Supreme Court precedent *requiring* the Department to set effluent limits based on narrative water quality standards. 40 C.F.R. §§ 122.44(d), 123.25(a)(15) (directing that NPDES permits must "[a]chieve water quality standards . . . including State narrative criteria for water quality" and applying this requirement to state programs); *id.* § 131.11(a)(2) (authorizing states to use narrative water quality standards to address toxic pollutants); *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 715 (1994) ("EPA has not interpreted § 303 [of the Clean Water Act] to require the States to protect designated uses exclusively through enforcement of numerical criteria."); *Ohio Valley Env't Coal. v. Fola Coal Co.*, LLC, 845 F.3d 133, 144 (4th Cir. 2017) (explaining that a polluter "could not" argue that narrative standards cannot be enforced "given that the Supreme Court has held to the contrary").

46

between EPA and North Carolina governing how the state must implement the Clean Water Act's permitting program.

167.     The Department appealed the decision to North Carolina's Wake County Superior Court and the case is still ongoing.[7] In the meantime, EPA has sent two letters explaining the legal errors in the administrative court order and confirming that the Department not only had authority to limit Asheboro's 1,4-dioxane pollution, but in fact was *required* to do so.

168.     The Wake County Superior Court issued an order clarifying that the 2012 NPDES permit—not the 2023 NPDES permit at issue in that litigation—governs Asheboro's discharges until further notice.

**Defendants have *increased* their 1,4-dioxane pollution over the past several months.**

169.     In the months since the administrative court order, Asheboro's toxic 1,4-dioxane pollution has skyrocketed to the highest levels ever reported from a municipal wastewater plant in North Carolina. Recent data shows that Asheboro has discharged 1,4-dioxane at concentrations as high as 3,520 ppb, 163 times the level the Department determined would protect downstream drinking water supplies (21.58 ppb).

---

[7] While illustrative of Asheboro's attempt to evade toxic chemical regulation, a decision in the ongoing case regarding the state's authority to set limits based on narrative water quality standards does not impact this Complaint. The 2012 NPDES permit is the relevant permit for purposes of this litigation and has been the effective permit at all times relevant to this Complaint. The claims before this Court are therefore entirely independent from the ongoing state court litigation regarding the 2023 NPDES Permit.

47

170.    It is likely these grab samples do not capture all of Asheboro's increased pollution. The composite samples taken of Asheboro's effluent over the past several months show, at times, that the average concentration of pollution is *even higher* than levels reflected in grab samples.

| Table 3 Asheboro's 1,4-Dioxane Discharges | | |
|---|---|---|
| **Date** | **Grab Sample: 1,4-Dioxane Concentration (ppb)** | **Composite Sample: 1,4-Dioxane Concentration (ppb)** |
| 9/13/2024 | 34.4 | 60 |
| 9/20/2024 | 9.7 | 23 |
| 9/27/2024 | 23.4 | 25 |
| 10/4/2024 | 116 | 24 |
| 10/11/2024 | 82.5 | 35 |
| 10/18/2024 | 12.5 | 570 |
| 10/25/2024 | 7.88 | 16 |
| 11/1/2024 | 2.58 | 540 |
| 11/8/2024 | 5.86 | 75 |
| 11/15/2024 | <2.0 | *Not sampled* |
| 11/22/2024 | 368 | *Not sampled* |
| 11/25/2024 | 261 | *Not sampled* |
| 12/6/2024 | 813 | 510 |
| 12/13/2024 | 3.14 | 49 |
| 12/20/2024 | 39.0 | *Not sampled* |
| 12/23/2024 | 15.3 | *Not sampled* |
| 1/3/2025 | 107 | 49 |
| 1/10/2025 | 47.6 | 74 |
| 1/17/2025 | 50.4 | 71 |
| 1/24/2025 | 3,520 | 2,300 |
| 1/31/2025 | 440 | 1,200 |
| 2/7/2025 | 75.3 | 34 |
| 2/14/2025 | 20.8 | 27 |
| 2/21/2025 | 22.1 | 29 |
| 2/28/2025 | 45.1 | 36 |
| 3/7/2025 | 25.6 | 34 |
| 3/14/2025 | 28.2 | 29 |
| 3/21/2025 | 20.0 | 25 |
| 3/28/2025 | 26.9 | 31 |
| 4/4/2025 | 18.2 | 19 |
| 4/11/2025 | 17.7 | 13 |
| 4/17/2025 | 175 | *Not sampled* |
| 4/25/2025 | 826 | 150 |
| 5/2/2025 | 10.6 | 15 |
| 5/9/2025 | 35.6 | 19 |

49

171.    The following graph shows the levels of 1,4-dioxane in Asheboro's effluent over the past year, which have markedly increased since the order from the administrative court:



172.    Asheboro's 1,4-dioxane pollution has increased over the past several months because the city has given StarPet permission to turn off its 1,4-dioxane pretreatment system at least three times since the administrative court's order (*see* Paragraphs 102–104 above). Each time, Asheboro and StarPet both knew StarPet would discharge "untreated water" containing 1,4-dioxane to Asheboro's wastewater plant—

50

untreated water that would ultimately flow towards downstream drinking water sources. Nevertheless, each time, Asheboro did not object, did not ask further questions, did not require StarPet to provide additional justification for shutting off its pretreatment system, and did not require StarPet to utilize backup treatment technologies or make any attempts to divert its untreated wastewater.

173. StarPet's pollution, and Asheboro's failure to control it, caused drastically high levels of toxic chemical pollution to flow into downstream drinking water supplies.

174. For instance, in October 2024, StarPet informed Asheboro that it was turning off its pretreatment system. StarPet released an estimated 27,143 gallons of untreated 1,4-dioxane laden wastewater to Asheboro's wastewater plant, causing the city to discharge the toxic chemical at levels averaging 570 ppb.

175. In December 2024, StarPet informed Asheboro that it would again shut down its pretreatment system, and as a result, Asheboro discharged 1,4-dioxane at 813 ppb.

176. On January 16, 2025, StarPet again took its 1,4-dioxane treatment system offline, informing Asheboro. The pretreatment system remained fully offline until at least January 28, 2025, and the system malfunctioned until at least February 10, 2025. During this time, Asheboro discharged 1,4-dioxane at levels as high as 3,520 ppb. A composite (average) sample of Asheboro's effluent between January 20th and January 24th measured 2,300 ppb.

51

177.     On April 17, 2025 StarPet dumped high levels of 1,4-dioxane into Asheboro's wastewater plant, at 24,900 ppb. About a week later, this slug of pollution again caused Asheboro to release 1,4-dioxane into Haskett Creek, this time reaching 826 ppb. Records detailing the cause of this elevated discharge have not been made publicly available.

*** 

178.     Asheboro has, for at least a decade, allowed StarPet and other industrial users to send highly contaminated wastewater into the city's wastewater plant. The city welcomed this pollution despite knowing it would flow straight through its wastewater plant and into downstream drinking water supplies.

179.     Defendants have not imposed measures to stop their 1,4-dioxane pollution, and it is consequently ongoing. 1,4-Dioxane pollution from Asheboro and StarPet has been, and continues to be, released into Haskett Creek, flowing through the Deep River and into the Cape Fear River. It pollutes the drinking water supplies for numerous communities, including the cities of Sanford, Fayetteville, and Wilmington, and the other localities that receive water from affected municipal providers.

## COUNT I

### The City of Asheboro's Unauthorized Discharges of 1,4-Dioxane
### (33 U.S.C. §§ 1311, 1342)

180.    Conservation Groups repeat, re-allege, and incorporate by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

181.    Asheboro is violating the Clean Water Act and its NPDES permit by discharging 1,4-dioxane—a toxic chemical that it is not authorized to discharge—into Haskett Creek.

182.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), provides that "the discharge of any pollutant by any person" is unlawful, unless the discharge complies with various enumerated sections of the Clean Water Act. Among other things, Section 301(a) prohibits the discharge of any pollutant not authorized by an NPDES permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342.

183.    The Clean Water Act defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). And "navigable waters" are defined as "waters of the United States, including the territorial seas." *Id.* § 1362(7).

184.    A citizen suit under 33 U.S.C. § 1365(a)(1) may be brought against any person for the unauthorized discharge of pollutants into waters of the United States. *Id.* § 1365(f).

185.    The city of Asheboro is a "person" under the Clean Water Act. *Id.* § 1362(5) (defining "person" to include municipalities).

53

186.    Haskett Creek is a "water of the United States" within the meaning of the Clean Water Act. *Id.* § 1362(7).

187.    1,4-Dioxane is a "pollutant" under the Clean Water Act because it is a chemical, industrial, or municipal waste. *Id.* § 1362(6).

188.    Asheboro discharges its wastewater into Haskett Creek via Outfall 001. Outfall 001 is a "point source" under the Clean Water Act. *Id.* § 1362(14).

189.    Asheboro's NPDES permit does not authorize the discharge of 1,4-dioxane.

190.    Instead, the permit states that "the exclusive authority to operate and discharge from this facility arises under the permit conditions, requirements, terms, and provisions described herein," none of which allow for the discharge of 1,4-dioxane.

191.    At no point prior to the issuance of its operative NPDES permit did Asheboro disclose the presence of 1,4-dioxane in its discharges, nor did the Department reasonably contemplate the presence of 1,4-dioxane in those discharges.

192.    Asheboro's discharges of 1,4-dioxane into Haskett Creek were first detected in 2015, and the city continues to discharge 1,4-dioxane into Haskett Creek without authorization of an NPDES permit.

193.    Accordingly, the city of Asheboro has discharged and continues to discharge wastewater containing 1,4-dioxane, an industrial pollutant, into waters of the United States without authorization of an NPDES permit in violation of (1) the Clean Water Act's prohibition on unauthorized discharges and (2) its NPDES permit.

54

194.    Asheboro has discharged 1,4-dioxane on at least 226 occasions since March 26, 2020, on which 1,4-dioxane was detected and published in the city's discharge monitoring reports—and on an untold number of other days when monitoring was not conducted. Given that these 226 occasions represent 97 percent of all sampled discharges, it is likely that Asheboro's unlawful discharges have occurred nearly every day since March 26, 2020, and are ongoing. Each of these discharges is a separate and distinct violation of the Clean Water Act. 33 U.S.C. §§ 1311(a), 1319(d); 40 C.F.R. § 122.41(a).

195.    Each of these discharges is also a separate and distinct violation of Asheboro's NPDES permit, which does not implicitly or explicitly authorize the discharge of 1,4-dioxane. *Piney Run Pres. Ass'n*, 268 F.3d at 268 (stating that an unauthorized discharge of a pollutant is a violation of both the Clean Water Act and the discharger's NPDES permit).

## COUNT II

### StarPet's Unlawful Pass Through
### (33 U.S.C. § 1317)

196.    Conservation Groups repeat, re-allege, and incorporate by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

197.    StarPet releases 1,4-dioxane pollution that flows into and exits Asheboro's wastewater plant into Haskett Creek. By releasing this pollution, StarPet has caused and continues to cause unlawful Pass Through in violation of federal law, Asheboro's sewer use ordinance, and its industrial user permit.

55

198. Haskett Creek is both a water of the United States, as defined in the Clean Water Act and its implementing regulations, and a water of the State as defined in state law and Asheboro's sewer use ordinance.

199. First, StarPet's 1,4-dioxane discharges constitute unlawful Pass Through as defined in, and prohibited by, federal law. The federal Clean Water Act's Pretreatment Standards prohibit industrial users from introducing any pollutants into the wastewater plant that cause Pass Through. 33 U.S.C. § 1317(b), (d); 40 C.F.R. § 403.5(a)(1). The federal prohibition on Pass Through is a Pretreatment Standard enforceable via citizen suit. 33 U.S.C. § 1365(a)(1), (f).

200. Pass Through is defined as "a Discharge which exits the [wastewater plant] into waters of the United States in quantities or concentrations which, alone or in conjunction with a discharge or discharges from other sources, is a cause of a violation of any requirement of the [wastewater plant's] NPDES permit (including an increase in the magnitude or duration of a violation)." 40 C.F.R. § 403.3(p).

201. StarPet's 1,4-dioxane pollution flows into and exits out of Asheboro's wastewater plant. In doing so, StarPet's 1,4-dioxane pollution, caused and continues to cause, Asheboro to make unauthorized discharges of 1,4-dioxane in violation of its NPDES permit and the Clean Water Act, as set forth in Count I. *Piney Run Pres. Ass'n*, 268 F.3d at 268; 33 U.S.C. § 1311(a). StarPet's 1,4-dioxane discharges thus constitute unlawful Pass Through and violate federal Pretreatment Standards.

Case 1:25-cv-00440-WO-JLW    Document 1    Filed 06/03/25    Page 56 of 77

202. Second, StarPet's 1,4-dioxane discharges violate the provisions in Asheboro's sewer use ordinance, which constitute "local limits" and are deemed Pretreatment Standards, 40 C.F.R. § 403.5(d), also enforceable by citizen suit, 33 U.S.C. § 1365(a)(1), (f).

203. Asheboro adopted a local sewer use ordinance to "enable[] the city to comply with all applicable state and federal laws, including the Clean Water Act (33 U.S.C. § 1251 et seq.) and the General Pretreatment Regulations (40 CFR Part 403)." Asheboro, N.C., Code of Ordinances § 52.01(A).

204. Like the federal Pretreatment Standards, Section 52.05(A) of Asheboro's sewer use ordinance specifically prohibits industrial users from discharging any pollutant which causes or contributes to Pass Through.

205. Asheboro's sewer use ordinance defines Pass Through as a "discharge which exits the [wastewater plant] into waters of the state in quantities or concentrations which, alone or with discharges from other sources, causes a violation, including an increase in the magnitude or duration of a violation of the [wastewater plant's] NPDES permit . . . or a downstream water quality standard *even if not included in the permit*." *Id.* § 52.02 (emphasis added).

206. Asheboro's sewer use ordinance also explicitly prohibits the discharge of "[a]ny wastewater causing the treatment plant effluent to violate State Water Quality Standards for toxic substances as described in 15A NCAC 2B .0200." *Id.* § 52.05(B)(19).

207.    Asheboro's sewer use ordinance further requires that industrial users "provide wastewater treatment as necessary to comply with" federal and local prohibitions on Pass Through. *Id.* § 52.11(A).

208.    StarPet's 1,4-dioxane pollution violates Asheboro's sewer use ordinance by causing Asheboro to violate its NPDES permit and thereby causing Pass Through (as established in Paragraphs 199–201).

209.    StarPet's 1,4-dioxane pollution also causes Asheboro to violate water quality standards thereby causing Pass Through, as defined by the sewer use ordinance, and violating the express prohibitions in the city's sewer use ordinance.

210.    StarPet's ongoing 1,4-dioxane discharges have caused or contributed to Asheboro violating water quality standards on numerous occasions.

211.    North Carolina's water quality standards include a toxic substances standard, 15A N.C. Admin. Code 02B .0208, which states that carcinogens (such as 1,4-dioxane) must be limited to levels below the one-in-one million cancer risk. Using the formula in 15A N.C. Admin. Code 02B .0208, the North Carolina Department of Environmental Quality determined that to keep 1,4-dioxane below the one-in-one million cancer risk, the ambient concentration of 1,4-dioxane in surface water would need to stay below 80 ppb in non-water supply waters and 0.35 ppb in waters that serve as drinking water supplies. The Department thus determined that Asheboro's discharge would have to have a 1,4-dioxane concentration of 21.58 ppb or less.

58

212. StarPet discharges wastewater to the city's wastewater plant at remarkably high concentrations, at times as high as 375,000 ppb. StarPet's pollution has caused Asheboro to discharge 1,4-dioxane at levels up to 3,520 ppb—163 times the concentration that would comply with water quality standards.

213. StarPet's ongoing 1,4-dioxane discharges have thus caused or contributed to Asheboro violating water quality standards (in particular, the toxic substances standard) on at least the 159 occasions when Asheboro's 1,4-dioxane pollution exceeded 21.58 ppb, since March 26, 2020. This violates Section 52.05(B)(19) of Asheboro's sewer use ordinance *and* the prohibition on Pass Through, which under the sewer use ordinance's definition expressly includes discharges that violate water quality standards.

214. StarPet has further failed to install pretreatment technology sufficient to prevent its 1,4-dioxane pollution from causing Pass Through or otherwise violating federal and local law, also in violation of Section 52.11(A) of Asheboro's sewer use ordinance. StarPet has known since at least 2021 that its pretreatment system is inadequate to prevent "slug discharges" of 1,4-dioxane from entering and being discharged from Asheboro's wastewater plant, but it has not taken actions to prevent its pollution from passing through the wastewater plant.

215. Finally, StarPet's 1,4-dioxane discharges violate the industry's industrial user permit. StarPet's industrial user permit (and the terms within that permit) also constitute "local limits" and are deemed Pretreatment Standards, 40 C.F.R. § 403.5(d), enforceable by citizen suit, 33 U.S.C. § 1365(a)(1), (f).

59

216. StarPet discharges wastewater to Asheboro's wastewater plant pursuant to Industrial User Permit Number 2228, which became effective on July 30, 2022. StarPet's industrial user permit requires it to comply with federal Pretreatment Standards and Asheboro's sewer use ordinance. By failing to comply with federal Pretreatment Standards and Asheboro's sewer use ordinance (as set forth in Paragraphs 199–214), StarPet has violated, and continues to violate, its industrial user permit.

217. StarPet has not been issued a permit limit for 1,4-dioxane in its industrial user permit designed to prevent Pass Through. StarPet has known or has had reason to know that its 1,4-dioxane discharges would cause Pass Through.

218. In total, StarPet has caused or contributed to Pass Through on at least 226 occasions since March 26, 2020, when 1,4-dioxane was detected in Asheboro's wastewater discharges—and on an untold number of other days when Asheboro's wastewater was not monitored. Each day that StarPet causes Pass Through by discharging 1,4-dioxane to Asheboro's wastewater plant, StarPet commits a separate violation of the federal Pretreatment Standards, 33 U.S.C. § 1317(b), (d) and 40 C.F.R. § 403.5(a)(1), North Carolina pretreatment standards, 15A N.C. Admin. Code 02H .0909, Asheboro's sewer use ordinance, and its industrial user permit, and in turn, the Clean Water Act, 33 U.S.C. § 1319(d).

219. These violations have occurred nearly every day since at least March 26, 2020 and are ongoing.

60

## COUNT III

### The City of Asheboro's Failure to Prevent Pass Through
### (33 U.S.C. §§ 1311, 1317, 1342)

220. Conservation Groups repeat, re-allege, and incorporate by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

221. Asheboro is violating the terms of its NPDES permit and federal law by allowing pollution from its industrial users to pass through its wastewater plant, untreated, and into downstream drinking water supplies.

222. Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants unless the discharge complies with the terms of an NPDES permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342. NPDES permittees must comply with all conditions of their NPDES permit, including all effluent limitations, monitoring and reporting requirements, and standard conditions applicable to municipal wastewater plants.

223. Clean Water Act regulations provide that "[a]ny permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action." 40 C.F.R. § 122.41(a). A citizen suit may be brought for violations of "an effluent standard or limitation," defined to include "a permit or condition" thereof. 33 U.S.C. § 1365(a)(1), (f).

224. Part IV(C)(2)(a) of Asheboro's NPDES permit requires the city to "develop and enforce" its pretreatment program to prevent industrial users from causing Pass Through.

61

225.    Asheboro's NPDES permit defines Pass Through in Part IV(A) as "[a] discharge which exits the [wastewater plant] into waters of the State in quantities or concentrations which, alone or with discharges from other sources, causes a violation, including an increase in the magnitude or duration of a violation, of the Permittee's . . . NPDES . . . permit."

226.    To ensure that industrial users will not cause Pass Through, Asheboro is required by Part IV(C)(2)(c) of its NPDES permit to "investigate the source of all discharges" to its wastewater plant and by Part IV(D)(5) of its NPDES permit to establish in industrial user permits "limitations, sampling protocols, reporting requirements, appropriate standard and special conditions, and compliance schedules as necessary."

227.    Part IV(D) of Asheboro's NPDES permit also requires that the city comply with federal pretreatment regulations to ensure that industrial users do not cause Pass Through.

228.    Federal regulations instruct that the city "shall develop and enforce specific limits to implement" the prohibition on Pass Through. 40 C.F.R. § 403.5(c)(1).

229.    Federal regulations also mandate that Asheboro "shall at all times be fully and effectively exercis[ing] and implement[ing]" a series of federal Pretreatment Requirements to ensure that the city does not allow Pass Through. 40 C.F.R. § 403.8(f). The Federal Pretreatment Requirements mandate that municipal wastewater plants like Asheboro are obligated to:

a. "Identify the character and volume of pollutants contributed to the [wastewater plant] by the Industrial Users;" *id.* § 403.8(f)(2)(ii),

b. "Deny or condition new or increased contributions of pollutants, or changes in the nature of pollutants, to the [wastewater plant] by Industrial Users where such contributions do not meet applicable Pretreatment Standards and Requirements or where such contributions would cause the [wastewater plant] to violate its NPDES permit;" *id.* § 403.8(f)(1)(i),

c. "Require compliance with applicable Pretreatment Standards and Requirements by Industrial Users;" *id.* § 403.8(f)(1)(ii),

d. "Control through Permit, order, or similar means, the contribution to the [wastewater plant] by each Industrial User to ensure compliance with applicable Pretreatment Standards and Requirements;" *id.* § 403.8(f)(1)(iii),

e. Set "[e]ffluent limits . . . based on applicable" federal Pretreatment Standards and State and local law." *id.* § 403.8(f)(1)(iii)(B)(3),

f. Set "[r]equirements to control Slug Discharges;" *id.* § 403.8(f)(1)(iii)(B)(6), and

g. "Require . . . the installation of technology required to meet applicable Pretreatment Standards and Requirements." *id.* § 403.8(f)(1)(iv).

230.    Federal regulations also set forth a Pretreatment Requirement that a wastewater plant "shall have authority and procedures immediately and effectively to halt or prevent any discharge of pollutants to the [wastewater plant] which reasonably appears

63

to present an imminent endangerment to the health or welfare of persons." 40 C.F.R. §
403.8(f)(1)(vi)(B).

231.    Asheboro receives 1,4-dioxane laden wastewater from StarPet and the
landfill. The city does not require the industrial users to pretreat this wastewater for 1,4-
dioxane, nor does the city remove the 1,4-dioxane once it reaches its wastewater plant.
As a result, each time an industrial user sends 1,4-dioxane to the city's wastewater plant,
it passes through the wastewater plant and into Haskett Creek.

232.    StarPet's 1,4-dioxane pollution causes Asheboro to violate its NPDES
permit and therefore constitutes unlawful Pass Through, as set forth in Count II.
Asheboro is not acting to prevent this Pass Through.

233.    The landfill's 1,4-dioxane pollution also causes Asheboro to violate its
NPDES permit, thereby causing Pass Through as defined under the federal Pretreatment
Standards. The landfill's leachate discharges contain high concentrations of 1,4-dioxane
which exit Asheboro's wastewater plant into Haskett Creek, a water of the United States,
causing Asheboro to violate its NPDES permit. Yet Asheboro has made no attempt to
prevent this Pass Through.

234.    Asheboro is obligated by its NPDES permit and the federal rules
incorporated within it to use its pretreatment authority to prevent such Pass Through from
occurring. But the city has not done so.

235.    Asheboro has not imposed 1,4-dioxane limits or conditions into industrial
user permits that would curtail the industries' 1,4-dioxane pollution.

64

236.     Asheboro is not "[i]dentify[ing] the character and volume of" 1,4-dioxane

that StarPet and the landfill contribute to its wastewater plant. For instance, Asheboro has

not sampled the landfill's leachate for 1,4-dioxane since August 2022, despite

Asheboro's prior sampling confirming the presence of 1,4-dioxane in the leachate in high

quantities, and the landfill's state-mandated annual sampling indicating its levels are still

high.

237.     Asheboro has not "[d]en[ied] or condition[ed] new or increased

contributions of pollutants, or changes in the nature of pollutants." Instead, the city has

on numerous occasions allowed its industrial users to increase the amount of toxic 1,4-

dioxane flowing to the city's wastewater plant without establishing any controls or

conditions. The city has allowed StarPet, for instance, to *turn off* its pretreatment

technology at least five times since November 2020 and has not imposed any conditions

on the industry to ensure that levels of 1,4-dioxane would not increase or would not cause

the city to violate its NPDES permit.

238.     Asheboro has not "[c]ontrol[led] through Permit, order, or similar means,

the contribution to the [wastewater plant] by each Industrial User to ensure compliance

with applicable Pretreatment Standards and Requirements." In fact, Asheboro has not

imposed *any* conditions or limits pertaining to 1,4-dioxane in its industrial user permits,

including those issued to StarPet and the landfill.

65

239. Likewise, Asheboro has not set "[e]ffluent limits" or "[r]equirements to control Slug Discharges," nor "[r]equire[d]…the installation of technology" to address its industrial users' ongoing 1,4-dioxane pollution.

240. Moreover, Asheboro has not "halt[ed] or prevent[ed]" the release of toxic 1,4-dioxane. 1,4-Dioxane is toxic to humans and cannot be removed by conventional drinking water treatment technology. Asheboro's ongoing failure to "halt or prevent" this chemical pollution therefore reasonably presents an "imminent endangerment" to communities and individuals drinking water downstream of the city's discharge.

241. Each time Asheboro fails to control 1,4-dioxane from its industrial users, the city fails to enforce its pretreatment program to prevent Pass Through in violation of its NPDES permit and the federal law, including federal Pretreatment Requirements. These violations have occurred at least 226 times since March 26, 2020 and are ongoing.

## <u>COUNT IV</u>

**The City of Asheboro's Failure to Enforce its Sewer Use Ordinance**
**(33 U.S.C. §§ 1311, 1317, 1342)**

242. Conservation Groups repeat, re-allege, and incorporate by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

243. By failing to require its industrial users to treat or otherwise control their 1,4-dioxane pollution, as required by the city's sewer use ordinance, Asheboro is abdicating its duties under both the Clean Water Act pretreatment program and its NPDES permit.

66

244.     Federal regulations mandate that wastewater plants "shall at all times be fully and effectively exercis[ing] and implement[ing]" its pretreatment program through, in part, local laws or ordinances that enable compliance with federal Pretreatment Standards and Requirements. 40 C.F.R. § 403.8(f)(1). North Carolina requires wastewater plants to develop a sewer use ordinance that provides the utility "the legal authority for implementing the pretreatment program." 15A N.C. Admin. Code 02H .0906(b)(1).

245.     Asheboro's sewer use ordinance was adopted to "enable[] the city to comply with all applicable state and federal laws, including the Clean Water Act (33 U.S.C. § 1251 et seq.) and the General Pretreatment Regulations (40 CFR Part 403)." Asheboro, N.C., Code of Ordinances § 52.01(A).

246.     Section 52.01(C) of Asheboro's sewer use ordinance directs the city to "administer, implement, and enforce" the provisions of its sewer use ordinance against its industrial users.

247.     Section 52.05(A) of Asheboro's sewer use ordinance specifically prohibits any discharge which causes or contributes to Pass Through, defined as a "discharge which exits the [wastewater plant] into waters of the state in quantities or concentrations which, alone or with discharges from other sources, causes a violation, including an increase in the magnitude or duration of a violation of the [wastewater plant's] NPDES permit . . . or a downstream water quality standard even if not included in the permit."

248.     Section 52.11(A) of Asheboro's sewer use ordinance mandates that industrial users "provide wastewater treatment as necessary to comply with" federal

67

regulations and "the prohibitions set out in § 52.05" of the city's sewer use ordinance, which includes the prohibitions against Pass Through, § 52.05(A), and discharging wastewater in violation of water quality standards for toxic substances, § 52.05(B)(19).

249. The prohibitions and requirements within Asheboro's sewer use ordinance are local limits developed pursuant to 40 C.F.R. § 403.5(c)(1) to prevent Pass Through. Local limits are "deemed Pretreatment Standards," and are enforceable by a citizen suit brought pursuant to 33 U.S.C. § 1365(a)(1). 40 C.F.R. § 403.5(d); 33 U.S.C. § 1365(f) (defining "effluent standard or limitation" to include Pretreatment Standards).

250. Moreover, Asheboro's pretreatment program, including the city's sewer use ordinance, is an enforceable part of Asheboro's NPDES permit, Part IV(D), violations of which are subject to enforcement by citizen suit, 33 U.S.C. § 1365(a)(1), (f).

251. First, Asheboro is violating its sewer use ordinance by failing to prevent unlawful Pass Through pollution from StarPet. As discussed in Count II, StarPet has caused, and continues to cause or contribute to, Asheboro releasing 1,4-dioxane in violation of the city's NPDES permit. Asheboro's failure to control this pollution violates the city's sewer use ordinance.

252. Asheboro is further violating its sewer use ordinance by failing to prevent Pass Through pollution from the landfill. The landfill's leachate discharges contain high concentrations of 1,4-dioxane which exit Asheboro's wastewater plant into Haskett Creek. The landfill's 1,4-dioxane pollution thus causes Asheboro to violate its NPDES permit, causing Pass Through. This is prohibited by the city's sewer use ordinance.

68

253. Next, Asheboro is in violation of its sewer use ordinance by allowing its industrial users to cause its own wastewater plant discharges to violate water quality standards. As set forth in Count II and throughout, StarPet and the landfill have caused Asheboro to discharge 1,4-dioxane at levels that cause a violation of downstream water quality standards, including the toxic substances standard (e.g., discharges exceeding 21.58 ppb). By December 6, 2022, at the latest, the North Carolina Department of Environmental Quality had informed Asheboro that in order to comply with the toxic substances standard, the city would need to keep its discharge below 21.58 ppb. Asheboro has thus been aware of the Department's calculations of what level is necessary to avoid violating water quality standards for years.

254. Asheboro's industrial users have repeatedly caused Asheboro to violate water quality standards—and Asheboro allows this to happen. At times, Asheboro's industrial users have caused the city to discharge 1,4-dioxane at levels as high as 3,520 ppb—163 times greater than the level necessary to avoid exceeding water quality standards. By allowing its industrial users to send unlimited amounts of 1,4-dioxane into the city's wastewater system, Asheboro is violating the sewer use ordinance's prohibition on Pass Through (defined in Section 52.02 to include violations of water quality standards) and the ordinance's prohibition on discharging "[a]ny wastewater causing the treatment plant effluent to violate State Water Quality Standards for toxic substances as described in 15A NCAC 2B .0200."

69

255. Asheboro has further violated and continues to violate Section 52.11(A) of its sewer use ordinance by failing to require that its industrial users provide necessary wastewater treatment. For instance, the city has made *no attempt whatsoever* to require the landfill to install pretreatment technology, allowing unchecked 1,4-dioxane pollution from the landfill. Although StarPet, has installed some pretreatment that could be used to remove or reduce concentrations of 1,4-dioxane, Asheboro does not require the industry to routinely use its pretreatment system, and has at times permitted the industry to shut its system off entirely.

256. Asheboro is mandated by federal law to "fully and effectively" implement its sewer use ordinance, including (1) the prohibition against Pass Through, (2) the ordinance's prohibitions against discharges that cause the utility to violate the water quality standards, and (3) the requirement that all industries install technology necessary to prevent Pass Through and ensure Asheboro complies with water quality standards. Asheboro must also comply with these requirements of its sewer use ordinance as a condition of its NPDES permit.

257. Asheboro has thus violated, and continues to violate, the Clean Water Act and its NPDES permit every day that the city has discharged 1,4-dioxane, on at least 226 occasions since March 26, 2020, including but not limited to each of the 159 days that it discharged 1,4-dioxane above 21.58 ppb in violation of 15A N.C. Admin. Code 02B .0208 and Section 52.05(B)(19) of Asheboro's sewer use ordinance.

# COUNT V

## StarPet's Unlawful Bypass
### (33 U.S.C. § 1317)

258.    Conservation Groups repeat, re-allege, and incorporate by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

259.    StarPet violated, and continues to violate, its industrial user permit by diverting its wastewater around its pretreatment system, resulting in the discharge of untreated 1,4-dioxane to the Asheboro wastewater plant. StarPet's industrial user permit and the terms within constitute "local limits" and are deemed Pretreatment Standards, 40 C.F.R. § 403.5(d), enforceable by citizen suit, 33 U.S.C. § 1365(a)(1), (f).

260.    StarPet is authorized to discharge wastewater into the Asheboro wastewater plant pursuant to Industrial User Permit Number 2228 which became effective on July 30, 2022. Part II(7) of StarPet's industrial user permit prohibits bypass of treatment facilities unless certain conditions in federal pretreatment regulations are satisfied.

261.    Such federal pretreatment regulations prohibit any industrial user from allowing a bypass, defined as "the intentional diversion of wastestreams from any portion of an Industrial User's treatment facility," in violation of federal Pretreatment Standards or Requirements unless three conditions are met:

      a.    "Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;"

      b.    "There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance

71

during normal periods of equipment downtime. This condition is not
satisfied if adequate back-up equipment should have been installed in the
exercise of reasonable engineering judgment to prevent a bypass which
occurred during normal periods of equipment downtime or preventative
maintenance; and"

c. "The Industrial User submitted notices" to the wastewater plant as required
by the regulations.

40 C.F.R. § 403.17(a), (b), (d).

262. StarPet has committed unlawful bypasses in violation of its industrial user
permit and federal Pretreatment Standards and Requirements. StarPet has intentionally
shut down its pretreatment system at least six times over the past five years, including but
not limited to, instances in October 2021, March 2022, July 2022, October 2024,
December 2024, and January 2025.

263. During each of these pretreatment shutdowns, StarPet continued its
manufacturing operations, causing slugs of untreated wastewater containing extremely
high levels of 1,4-dioxane to enter Asheboro's wastewater plant.

264. Upon information and belief, neither life nor severe property damage were
at risk during any of these occasions. In addition, several feasible alternatives to the
bypasses existed, including "the use of auxiliary treatment facilities, retention of
untreated wastes, or maintenance during normal periods of equipment downtime." For

72

instance, StarPet could have paused its manufacturing operations or proactively installed treatment redundancies or backup equipment to prevent the bypasses from occurring.

265. StarPet has committed at least six unlawful bypasses in violation of the Clean Water Act and its industrial user permit.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court, pursuant to the Clean Water Act:

a.  DECLARE that Defendant Asheboro has violated and is violating the Clean Water Act and its NPDES permit, 33 U.S.C. §§ 1311(a), 1342, by discharging 1,4-dioxane into Haskett Creek without NPDES permit authorization;

b.  ORDER Defendant Asheboro to cease and abate these ongoing, unauthorized discharges of 1,4-dioxane;

c.  DECLARE that Defendant StarPet has violated and is violating federal Pretreatment Standards, 40 C.F.R. § 403.5(a)(1), North Carolina pretreatment standards, 15A N.C. Admin. Code 02H .0909, Asheboro's sewer use ordinance, and its industrial user permit—in turn, violating the Clean Water Act, 33 U.S.C. § 1317(b), (d)—by causing unlawful Pass Through;

d.    ORDER Defendant StarPet to cease its 1,4-dioxane discharges to Asheboro's wastewater plant and its violations of the Clean Water Act, state and local law, and its industrial user permit;

e.    DECLARE that Defendant Asheboro is violating the Clean Water Act and its NPDES permit, 33 U.S.C. §§ 1311(a), 1317(b), (d), 1342; 40 C.F.R. §§ 403.5, 403.8(f), by failing to prevent Pass Through, violating Pretreatment Requirements, and failing to enforce its sewer use ordinance;

f.    ORDER Defendant Asheboro to fully and effectively enforce its Pretreatment Program, and enjoin Defendant Asheboro from continuing to violate the terms and conditions imposed by its NPDES permit, including but not limited to requiring Asheboro to cease (1) allowing its industrial users to discharge unlimited amounts of 1,4-dioxane and (2) granting permission for industrial users to turn off existing treatment systems;

g.    DECLARE that Defendant StarPet has violated its industrial user permit and the Clean Water Act, 33 U.S.C. § 1317(b), (d); 40 C.F.R. § 403.17, by committing unlawful bypasses;

h.    ORDER Defendant StarPet to cease and abate its industrial user permit violations and unlawful bypasses, including but not limited to stopping StarPet's periodic, intentional cessations of its pretreatment system and/or, if these shutdowns are necessary, ceasing manufacturing operations,

utilizing backup treatment, and/or wastewater retention until the pretreatment system is fully functional once again;

i.      ORDER Defendants to pay civil penalties in an amount not to exceed $68,445 per day per violation for all violations of the Clean Water Act. 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4;

j.      AWARD Conservation Groups reasonable fees, costs, and expenses, including attorneys' fees and expert fees, associated with this litigation pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

k.      GRANT Conservation Groups any such further and additional relief as the Court may deem just and proper.

This the 3rd day of June 2025.

Respectfully submitted,

/s/ Hannah M. Nelson
Hannah M. Nelson Bar Number: 56565
Southern Environmental Law Center
136 East Rosemary Street, Suite 500
Chapel Hill, North Carolina 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
E-mail: hnelson@selc.org

Jean Zhuang Bar Number: 55635
Southern Environmental Law Center
136 East Rosemary Street, Suite 500
Chapel Hill, North Carolina 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
E-mail: jzhuang@selc.org

Zoe Mehta Bar Number: 60883
Southern Environmental Law Center
136 East Rosemary Street, Suite 500
Chapel Hill, North Carolina 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
E-mail: zmehta@selc.org

Kasey Moraveck Bar Number: 62554
Southern Environmental Law Center
136 East Rosemary Street, Suite 500
Chapel Hill, North Carolina 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
E-mail: kmoraveck@selc.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2025, I electronically filed the foregoing

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** with the Clerk

of Court using the CM/ECF System, which will send notification of such filing to the

users registered on the Court's CM/ECF System, and I hereby certify that I have mailed

the document to the following non-CM/ECF participants:

City of Asheboro
David Smith, Mayor
c/o Donald E. Duncan, Jr., City Manager
146 N. Church Street
PO Box 1106
Asheboro, NC 27204

Corporation Service Company
Registered Agent for Indorama Ventures USA, LLC
2626 Glenwood Avenue, Suite 550
Raleigh, NC 27608

Corporation Service Company
Registered Agent for StarPet Inc.
2626 Glenwood Avenue, Suite 550
Raleigh, NC 27608

/s/ Hannah M. Nelson
Hannah M. Nelson
Southern Environmental Law Center
136 East Rosemary Street, Suite 500
Chapel Hill, North Carolina 27514
Telephone: (919) 967-1450
E-mail: hnelson@selc.org
Bar Number: 56565

77