UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:25-cv-00440-WO-JLW

| | | |
|---|---|---|
| CAPE FEAR RIVER WATCH and HAW RIVER ASSEMBLY,<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF ASHEBORO; INDORAMA VENTURES USA, LLC, and STARPET INC.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR A STAY OF PROCEEDINGS** |

NOW COMES Defendant City of Asheboro ("Asheboro"), by and through the undersigned counsel, and respectfully submits this Memorandum of Law in support of its Motion to Dismiss, or, in the Alternative, for a Stay Of Proceedings pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). For the reasons set forth herein, Plaintiffs failed to state a claim against Asheboro, and Asheboro respectfully requests that its Motion to Dismiss be GRANTED and that Plaintiffs' claims be DISMISSED with prejudice.

Alternatively, Asheboro moves to stay this matter pending resolution of ongoing state and federal litigation discussed

herein which renders Plaintiffs' claims untimely and not yet ripe.

## INTRODUCTION

Plaintiffs Cape Fear River Watch and Haw River Assembly bring this citizen suit under the Clean Water Act ("CWA") seeking injunctive, declaratory, and monetary relief, and alleging violations relating to Asheboro's operation of its publicly owned treatment works (the "Facility"). Plaintiffs' claims fail as a matter of law and must be dismissed with prejudice because: (1) the claims seek to relitigate matters which are currently being addressed and resolved by state and federal authorities, contrary to the CWA's citizen suit provisions; (2) Asheboro's compliance with the terms of its state-issued National Pollutant Discharge Elimination System ("NPDES") permit invokes the CWA's "permit shield," which bars Plaintiffs' claims; (3) Plaintiffs improperly seek to enforce requirements not included in Asheboro's permit or established through binding rulemaking, in violation of procedural and substantive limitations on citizen suits; and (4) Plaintiffs fail to plead plausible ongoing violations of the CWA as is required. Most of Plaintiffs' pleading

deficiencies trace back to a single, dispositive fact: their claims rest on the terms of a 2012 NPDES permit (ECF No. 1, ¶ 125), yet a new permit superseded it in 2025 before this lawsuit was filed.

For the reasons set forth below, the Complaint is jurisdictionally barred under Federal Rule of Civil Procedure 12(b)(1) and fails to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## STATEMENT OF THE CASE

Plaintiffs misstate or omit the key facts and procedural history of this dispute to avoid dismissal and justify frivolous claims. They proclaim that Asheboro is a "polluter" that "systematically attempted to dismantle the North Carolina Department of Environmental Quality's ["DEQ"] authority to regulate" 1,4-dioxane and "has teamed up with other[s] . . . to fight against toxic chemical regulation." *Id.* at ¶ 5. This is not supported by the facts. Rather, DEQ first attempted to include 1,4-dioxane effluent limitations in a renewal NPDES permit it issued to Asheboro in August 2023. Asheboro then initiated litigation before the Office of Administrative Hearings ("OAH") because it believed DEQ

violated the law by circumventing North Carolina's Administrative Procedure Act ("NCAPA") and including a 1,4-dioxane limitation without following statutorily required rulemaking procedures. The OAH agreed.

OAH Chief Administrative Law Judge Donald van der Vaart granted summary judgment in Asheboro's favor on September 12, 2024, concluding that: (1) any 1,4-dioxane effluent discharge limitation was "void and unenforceable;" (2) DEQ acted arbitrarily and capriciously by considering 1,4-dioxane a carcinogen; (3) DEQ acted arbitrarily and capriciously by failing to comply with the plain language of 15A NCAC 02B .0208(a)(2)(B) in calculating a water quality criterion for 1,4-dioxane; (4) DEQ acted arbitrarily and capriciously by authorizing the establishment of an enforceable 1,4-dioxane water quality standard; and (5) DEQ violated the NCAPA and N.C. Gen. Stat. § 143-214.1(d)(4) by issuing an NPDES permit with a 1,4-dioxane water quality standard without proper rulemaking. DEQ petitioned for judicial review of that decision, and the parties are currently preparing their briefs in the review proceedings. A hearing in the review proceedings is expected to be held by December 2025.

Following entry of summary judgment in Asheboro's favor, DEQ by consent, in January 2025, reinstated Asheboro's prior 2011 NPDES permit ("Reinstated Permit") and confirmed it would not issue a new permit with 1,4-dioxane limitations or enforce such limitations before the resolution of the pending appeal or a separate action by the U.S. Environmental Protection Agency ("EPA"). Consent Order Resolving Motion to Stay, No. 24CV032664-910, ¶ 7 at 3 (N.C. Super. Ct. Wake Cty. Jan. 28, 2025)("Consent Order"). Stated differently, DEQ reissued an NPDES permit to Asheboro in early 2025 without any limitation on 1,4-dioxane discharges despite having full knowledge that the regulatory environment remained unchanged. Clearly, the State of North Carolina (the "State") decided it must finalize the regulatory appeals process before it imposes CWA-related fines on Asheboro. Plaintiffs' dissatisfaction with the State's strategy does not provide them with standing.

Critically, the EPA is now reevaluating the scientific basis for DEQ's decision to include 1,4-dioxane limitations in Asheboro's permit. DEQ justified its inclusion of a 1,4-dioxane limitation in the 2023 NPDES permit by relying upon

scientific studies performed by EPA. City of Asheboro v. N.C. Dep't of Env't. Quality, OAH No. 24 EHR 00862, 24 EHR 01469, 24 EHR 01470, ¶ 34, at 16-17 (N.C. Office of Admin. Hearings Sept. 12, 2024) ("Final Decision").[1] Plaintiffs incorrectly describe 1,4-dioxane as a "cancer-causing chemical" about which the science is well-settled. ECF No. 1, ¶ 1. That is simply not the case. Before Plaintiffs filed this suit, Union Carbide challenged EPA's risk assessment of 1,4 dioxane. Petition for Review, *Union Carbide Corp. v. EPA*, No. 24-60615 (5th Cir. Dec. 4, 2024), https://dockets.justia.com/docket/circuit-courts/ca5/24-60615 (available via PACER). EPA has since admitted that its "1,4-dioxane 2024 supplemental risk evaluation and 2024 revised risk determination, as well as its underlying 2020 risk evaluation should be reconsidered." Second Declaration of Nancy B. Beck, Ph.D. in Support of Motion for Abeyance, *Union Carbide Corp. v. EPA*, No. 24-60615, at ¶ 3 (5th Cir. June 30, 2025). EPA is conducting a reconsideration in order to review and determine whether its cancer risk analysis was based on the best available science. *Id.* ¶ 4.

[1] The Complaint references the Final Decision in Footnote 6 and Paragraphs 165 and 166, as well as Footnote 9 in Exhibit A: Notice of Intent to Sue.

EPA is therefore reevaluating the science underlying its prior conclusions, as well as those of DEQ and Plaintiffs, regarding the safety of 1,4-dioxane. It expects this process to take between 12 and 18 months, after which time EPA "will be issuing a proposed revision to its risk evaluation framework rule to address additional issues of concern with the risk evaluation approach generally. The outcome of that rulemaking may impact elements of a revised 1,4-dioxane risk evaluation, including the determination of unreasonable risk." *Id.* ¶ 6. Allowing this litigation to proceed despite the pending reevaluation would waste judicial resources, as that reevaluation may negate the basis of Plaintiffs' claims or eliminate the relief they seek, in whole or in part.

Plaintiffs attempt to cast Asheboro as a scheming polluter bent on evading environmental regulation, but this distortion only underscores the weakness of their claims. Asheboro's central argument in the underlying regulatory litigation is that any 1,4-dioxane limitation must be established through lawful rulemaking and supported by sound science. There is no applicable state or federal water quality standard for 1,4-dioxane, and thus no lawful basis for 1,4-

dioxane effluent discharge limitations in NPDES permits. When first confronted with (unlawful) regulation of 1,4-dioxane, Asheboro asserted its rights in court and won. Since that time, Asheboro has remained engaged on a consistent and regular basis with both DEQ and EPA to determine the existence and extent of its responsibilities pertaining to 1,4-dioxane. Asheboro is involved in litigation with DEQ to ensure that any water quality standard enacted by the State is done through the proper rulemaking procedures established by the state legislature, and is engaged with EPA on the same issues and continued compliance with the CWA.[2]

Because the government is diligently prosecuting its own enforcement action, the Court lacks jurisdiction. Plaintiffs' dissatisfaction with the speed or strategy of that process does not give rise to a cognizable citizen suit under the CWA.

[2] EPA originally stated that it may supersede DEQ and issue its own NPDES permit to Asheboro with effluent limitations on 1,4-dioxane. Letter from Kathlene Butler, Water Div. Dir., U.S. EPA Region 4 to Richard Rogers, Dir., Div. of Water Resources, N.C. Dep't of Env't Quality, at 8 (Jan. 3, 2025), referenced in Paragraph 167 in the Complaint and included as Attachment 29 in Exhibit A: Notice of Intent to Sue. As permitted by statute, Asheboro requested a public hearing on the issue. Those actions are in progress, and as requested herein, appear to be stayed pending EPA's reevaluation of scientific studies on the alleged toxicity of 1,4-dioxane.

Rather than present the Court with these facts, Plaintiffs falsely state that Asheboro is currently and intentionally violating a valid water quality standard and an NPDES permit issued 13 years ago. Rather, the Reinstated Permit—the operative permit—contains no enforceable discharge limitation. Accordingly, dismissal is warranted.

## **STATEMENT OF RELEVANT FACTS**

Plaintiffs overstate the facts in claiming that Asheboro "teamed up" with known polluters to discharge "a cancer-causing chemical" named 1,4-dioxane into the waters of North Carolina, all as part of a broader effort to "dismantle [DEQ's] authority to regulate 1,4-dioxane" and harm the state's citizens. ECF No. 1, ¶¶ 1, 5, 42. They claim 1,4-dioxane is dangerous based upon "[r]ecent federal assessments [which] determined that exposure to 1,4-dioxane in drinking water poses an unreasonable risk to human health." *Id.* ¶ 88.

They further allege Asheboro violates the CWA by "discharging 1,4-dioxane without authorization" and in violation of an NPDES permit. *Id.* ¶ 10. And they allege that NPDES permit NC0026123, issued in 2012,[3] is the "operative

[3] Despite alleging that a 2012 permit controls its claims, Plaintiffs allege that 1,4-dioxane was first discovered in the relevant waterways in 2014, and

permit" governing its claims. *Id.* ¶¶ 10, 125, 191. Plaintiffs next allege that "[a]t no point prior to the issuance of its operative [2012] NPDES permit did Asheboro disclose the presence of 1,4-dioxane in its discharges, nor did the [DEQ] reasonably contemplate the presence of 1,4-dioxane in those discharges." *Id.* ¶¶ 126, 191. Plaintiffs admit that a discharge constitutes a CWA violation only if it was not disclosed to or contemplated by DEQ at the time the governing NPDES permit was issued. *Id.* ¶ 60.

Plaintiffs' allegations ring hollow. The State has never formally—nor legally—promulgated 1,4-dioxane water quality standards through the statutorily required notice and comment rulemaking process. *See id.* ¶¶ 151-57. DEQ attempted to circumvent the NCAPA and unilaterally impose an unlawful water quality standard on 1,4-dioxane discharges beginning in 2023. *Id.* ¶ 127; *see generally* Final Decision. Asheboro challenged DEQ's actions because the agency violated North Carolina law by attempting to enforce a water quality standard without engaging in statutorily required rulemaking. *Id.* ¶ 163. The OAH ruled in Asheboro's favor, concluding that the

---

that DEQ first informed Asheboro in 2022 that it should aim to keep discharges below 21.58 ppb. *Id.* ¶¶ 91, 149.

1,4-dioxane limitations on Asheboro never went into effect. *Id.* ¶ 165. In January 2025, the Superior Court clarified that the Reinstated Permit would take effect and governed Asheboro's discharges and the Facility pending conclusion of the Superior Court litigation. *Id.* ¶ 168. That litigation is ongoing. *Id.* ¶ 167.

Plaintiffs allege that most 1,4-dioxane purportedly discharged by Asheboro comes from industrial users. *Id.* ¶¶ 96, 134. As to pass-through discharges, Plaintiffs allege Asheboro has a duty under its NPDES permit to "take all reasonable steps to minimize or prevent any discharge" that is ***in violation of the terms of the effective NPDES permit***. *Id.* ¶ 132 (emphasis added). Just as the Reinstated Permit lacks a 1,4-dioxane discharge limitation, the industrial user permit issued to StarPet also contains no such limitation. *Id.* ¶ 139. Plaintiffs allege that Asheboro's sewer use ordinance "could give rise to enforcement actions" related to 1,4-dioxane. *Id.* ¶ 146. However, the ordinance does not authorize a citizen suit under the CWA or any other federal claim in the absence of a valid effluent limitation—which does not exist here.

## STANDARDS OF REVIEW

**A. Motion to Dismiss Under Rule 12(b)(1)**

Under Rule 12(b)(1), dismissal is warranted when the court lacks subject matter jurisdiction. Plaintiffs bear the burden of proving jurisdiction, and the court may consider evidence outside the pleadings to evaluate standing or jurisdictional predicates. *Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991), *cert. denied*, 503 U.S. 984 (1992).

**B. Motion to Dismiss Under Rule 12(b)(6)**

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. To survive dismissal, Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Conclusory allegations and the recitation of statutory terms do not suffice. Plaintiffs must demonstrate that their claims are plausible on their face and grounded in factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court "must consider the complaint in its entirety, as well as other sources ordinarily examined when

ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which the Court may take judicial notice." *Tellabs Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 (3d ed. 2004) (explaining that "[t]he allegations of the pleading will be supplemented by any relevant matter that can be judicially noticed . . . .").

## ARGUMENT

### A. This Court Lacks Jurisdiction Under the CWA's Diligent Prosecution Bar

Plaintiffs proceed as if they are entitled to exercise the enforcement prerogatives of the United States. Congress made clear that they are not. The remedies provided to plaintiffs filing citizen suits are purposefully limited and gap-filling in nature. The CWA prohibits citizen suits where state authorities or federal agencies are "diligently prosecuting" the same alleged violations. 33 U.S.C. §§ 1365(b)(1)(B), 1319(g)(6). A citizen suit is meant to

> supplement rather than to supplant governmental action. The legislative history of the [CWA] reinforces this view of the role of the citizen suit. The Senate Report noted that '[t]he Committee intends

> the great volume of enforcement actions [to] be brought by the State,' and that citizen suits are proper only 'if the Federal, State, and local agencies fail to exercise their enforcement responsibility.'

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987) (quoting S. Rep. No. 92-414, 64 (1971)). Courts rightly give significant leeway to state regulators and assume that they are acting diligently unless shown otherwise. *See Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*, 523 F.3d 453, 459 (4th Cir. 2008) (affirming CWA citizen suit's dismissal under Rule 12(b)(1)).

Plaintiffs wrongly assert that no action is pending to address alleged violations of the CWA. ECF No. 1, ¶ 18. In fact, DEQ filed a civil case against Asheboro in the Wake County Superior Court on October 11, 2024. The purpose of that ongoing litigation is to enable DEQ to "issue [and enforce] NPDES permits [to Asheboro] that will protect designated uses of receiving waters by not causing violations of water quality standards" pertaining to 1,4-dioxane. Petition for Judicial Review, No. 24CV032664-910, at 20–21, ¶ 24 (N.C. Super. Ct. Wake Cty. Oct. 11, 2024). DEQ stated in a related motion that the "case arises out of [DEQ]'s efforts

to protect drinking water in the Cape Fear River watershed by controlling the discharge of 1,4-dioxane, which EPA has determined is a likely carcinogen. As part of this effort, [DEQ] issued an NPDES permit to the City of Asheboro which included conditions designed to limit Asheboro's discharge of 1,4-dioxane." Petitioner's Motion to Stay Final Decision, No. 24CV032664-910, at 3 (N.C. Super. Ct. Wake Cty. Oct. 11, 2024). Like Plaintiffs' attempt here, the purpose of DEQ's litigation is to enable it to pursue 1,4-dioxane discharge violations against Asheboro.

Plaintiffs may find objectionable the speed at which DEQ is litigating its case, the route DEQ has taken to pursue enforcement, or the pace of EPA's review, but that provides them no relief. "State agencies are owed substantial deference when assessing the diligence of enforcement actions, and citizen plaintiffs bear a heavy burden to overcome this presumption of diligence." *Piney Run Pres. Ass'n*, 523 F.3d at 459 (stating that "diligence is presumed"); *see Sierra Club v. Two Elk Generation Partners, Ltd. P'ship*, 646 F.3d 1258, 1269 (10th Cir. 2011) (providing that "plaintiffs must meet a high standard to demonstrate" non-

diligence) (internal quotation marks omitted); *N. & S. Rivers Watershed Ass'n, Inc. v. Town of Scituate*, 949 F.2d 552, 557 (1st Cir. 1991) (concluding that "deference to the agency's plan of attack should be particularly favored"); *Cmty. of Cambridge Envtl. Health & Cmty. Dev. Grp. v. City of Cambridge*, 115 F. Supp. 2d 550, 554 (D. Md. 2000) ("Most courts considering the diligence of a state or federal prosecution have exhibited substantial deference for the agency's process."). Citizen suit plaintiffs cannot demonstrate non-diligence by showing that their prosecution strategy is purportedly more effective than the agency's. *See Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004) (stating that "second-guessing of . . . an appropriate remedy . . . fails to respect the statute's careful distribution of enforcement authority"); *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 761 (7th Cir. 2004) (providing that a citizen suit is not permitted "'[m]erely because the State may not be taking the precise action [the plaintiff] wants it to or moving with the alacrity [the plaintiff] desires'") (*quoting Scituate*, 949 F.2d at 558).

The question is whether the State is diligently and reasonably addressing perceived violations. It is. The State has initiated enforcement efforts and remains actively engaged in the matter. The OAH ruled that DEQ improperly included a water quality standard in Asheboro's permit, and DEQ appealed the OAH decision and decided to pursue additional action against Asheboro to determine the scope of its regulatory enforcement authority and to pursue sanctions for any discharges found in violation of its NPDES permit. The State is following the procedural steps it deems necessary to enforce 1,4-dioxane limitations and penalties against Asheboro. In addition, EPA is simultaneously reviewing whether Asheboro's permit must contain effluent limitations of 1,4-dioxane to comply with the CWA.

State and federal authorities are pursuing parallel actions to resolve whether the CWA requires the city of Asheboro to treat its water pursuant to a 1,4-dioxane effluent limitation and ultimately whether the city will be responsible for penalties for failing to comply therewith. Put simply, Plaintiffs ask this Court to interfere in pending regulatory and legal enforcement actions in contravention of

the limited role Congress intended for citizen suits to play. Plaintiffs' disagreement with the speed and course of these actions does not provide citizen suit standing, and the CWA expressly calls for dismissal of suits like these which seek to supplant the government's enforcement decisions.

Plaintiffs challenge Asheboro's handling of 1,4-dioxane and its objection to use of an improper narrative standard, which is the subject of active litigation by DEQ against Asheboro. The ongoing state litigation concerning the enforceability of 1,4-dioxane numeric criteria under 15A NCAC 02B .0208—and any associated sanctions or enforcement actions against Asheboro—precludes federal citizen suit intervention. Plaintiffs' conclusory assertions of non-diligence fall short of displacing the procedural safeguards and substantive deference afforded to state and federal enforcement. Plaintiffs should not be permitted to second-guess the government's choice of methods or timing. *See Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas LLC*, No. 1:14-cv-00753, 2015 WL 10890140, at 4 (M.D.N.C. Jan. 5, 2015) ("[C]itizen suit plaintiffs cannot demonstrate non-diligence by showing that their prosecution strategy is more aggressive

than the agency's."). Accordingly, this Court lacks jurisdiction to review these claims and dismissal is proper.

**B. The Permit Shield Bars Plaintiffs' Claims**

Citizen suits are only proper where an NPDES permit has been violated, which is not the case here. Under the CWA's "permit shield" provision, a city that follows the terms of its NPDES permit is considered in compliance with the law and cannot be held liable for discharges. 33 U.S.C. § 1342(k); *see Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 12 F.3d 353, 357 (2d Cir. 1994) (noting that the Supreme Court found the purpose of the permit shield was to relieve permit holders from having to litigate whether their permits are sufficiently strict) (citation omitted). This protection extends to discharges of pollutants that were disclosed to or reasonably contemplated by the permitting authority, even if not listed in the permit. *Piney Run Pres. Ass'n*, 268 F.3d at 259.

Plaintiffs mislead the Court by stating that "[a]t no point prior to the issuance of the operative NPDES permit did Asheboro disclose the presence of 1,4-dioxane in its discharges, nor did the Department reasonably contemplate"

that presence. ECF No. 1, ¶ 191. But as referenced earlier, this Complaint is premised on an incorrect statement of fact: that the operative NPDES permit was issued on June 27, 2012. *Id.* ¶¶ 125, 167, n.7 ("The 2012 NPDES permit is the relevant permit for purposes of this litigation and has been the effective permit at all times relevant to this Complaint. The claims before this Court are therefore entirely independent from the ongoing state court litigation regarding the 2023 NPDES Permit."). Footnote 7's misquotation underscores the central flaw in Plaintiffs' theory: it relies on a distorted account of the record. Once the effective date of the operative permit is properly understood, it becomes clear that dismissal is warranted.

As discussed above, Asheboro and DEQ have for years engaged in proceedings about the lawfulness of DEQ's attempts to regulate 1,4-dioxane via NPDES permits. After Asheboro won summary judgment and the OAH declared that any 1,4-dioxane effluent limitations on Asheboro's Facility are void and unenforceable, DEQ initiated further litigation against Asheboro in Wake County Superior Court. There, DEQ agreed to the Consent Order, which expressly and voluntarily executed

the Reinstated Permit. Consent Order at 1. That order from January 2025 established the NPDES permit terms Asheboro currently operates under and operated under at the time Plaintiffs' Complaint was filed. The Reinstated Permit is the operative permit. DEQ further agreed not to "take any action(s) to enforce the 2023 Permit [1,4-dioxane limitations] during the pendency" of the ongoing litigation. *Id.* at 3. Even if the Consent Order is dissolved, DEQ acknowledged that the 2023 NPDES permit would resume effect, excluding "the 1,4-dioxane effluent discharge limitations" set forth in that permit. *Id.* at 4.

DEQ entered into the Consent Order after significant proceedings regarding Asheboro's 1,4-dioxane discharges. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) (noting that the fact that an agency has entered into a consent decree with a violator that establishes a prospective schedule of compliance does not necessarily establish lack of diligence). At the time it executed the Reinstated Permit, DEQ not only reasonably contemplated future discharges, it had full knowledge that the Facility would discharge 1,4-dioxane in the future. Asheboro is operating under the terms of the

Reinstated Permit, which took effect in 2025—not in 2012—and expressly excludes limitations on 1,4-dioxane discharges. *See* Final Decision, ¶ 17 (N.C. Office of Admin Hearings Sept. 12, 2024).

Asheboro is in compliance with the Reinstated Permit and shielded from citizen suits under the CWA's permit shield provision, 33 U.S.C. § 1342(k). Plaintiffs not only fail to allege these key facts, but they also fail to allege that Asheboro violated the Reinstated Permit, that Asheboro's disclosures were inadequate or misleading, or that DEQ did not reasonably contemplate future discharges when it established the terms of the Reinstated Permit. And they cannot so plead, because DEQ's consent order reinstating the subject permit expressly discusses 1,4-dioxane. *See Piney Run Pres. Ass'n*, 268 F.3d at 259-64.

The permit shield bars Plaintiffs' claims because Asheboro is in full compliance with the operative Reinstated Permit. Moreover, DEQ not only reasonably contemplated 1,4-dioxane discharges by the Facility, but also expressly agreed not to impose any limitations on those discharges. Plaintiffs allege no facts to rebut the presumption that compliance with

the Reinstated Permit satisfies the CWA. Accordingly, the should be dismissed.

**C. Ongoing Violations Are Not Plausibly Alleged**

The CWA does not confer jurisdiction on federal courts to adjudicate citizen suits for wholly past violations. Rather, only violations that are continuing at the time the Complaint is filed provide jurisdiction for citizen suit claims. 33 U.S.C. § 1365; *Gwaltney*, 484 U.S. at 57 (holding that phrase "in violation" means citizen suits brought under CWA are intended to address present or future violations).

Plaintiffs' complaint focuses primarily on discharges allegedly occurring before 2025, and Plaintiffs fail to allege any violations occurring after January 2025, when the Reinstated Permit took effect and the permit shield became applicable. The Complaint entirely fails to identify specific facts or instances that plausibly establish ongoing or intermittent violations as the CWA requires for citizen suits.

Courts routinely dismiss citizen suits that rest on speculative or conclusory allegations of ongoing violations. The Fourth Circuit Court of Appeals has expressed that a

plaintiff must allege a state of continuous or intermittent violation *at the time of filing* to invoke subject matter jurisdiction. Chesa*peake Bay Found. v. Gwaltney of Smithfield*, 890 F.2d 690, 693 (4th Cir. 1989). Similarly, the Second Circuit affirmed dismissal where the plaintiff failed to plausibly allege that violations were ongoing *at the time the complaint was filed*. *Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1311–12 (2d Cir. 1993); *see Nat. Res. Def. Council, Inc. v. Cnty. of Los Angeles*, 725 F.3d 1194, 1205 (9th Cir. 2013) (holding that plaintiffs must offer specific evidence demonstrating current or reasonably likely future violations, rather than relying on general or historical allegations); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 175 (2000) ("[C]itizens lack statutory standing . . . to sue for violations that have ceased by the time the complaint is filed.").

Plaintiffs cannot meet their burden. Plaintiffs' allegations that violations are ongoing are based entirely on the false premise that the 2012 NPDES permit controls. ECF No. 1, ¶¶ 125, 167, 191, n.7. Since the issuance of the

Reinstated Permit in early 2025, Asheboro has operated under a valid permit that contains no discharge limitation for 1,4-dioxane and was adopted with DEQ's full knowledge that discharges of 1,4-dioxane would occur. That permit governs and restricts all discharges at the Facility. Plaintiffs cannot plead a plausible claim for relief; it is irrefutable that prior to the filing of Plaintiffs' Complaint, DEQ consented to and issued the Reinstated Permit with no 1,4-dioxane effluent discharge limitations and an express agreement not to enforce 1,4-dioxane limitations. Any allegedly improper discharges upon which Plaintiffs base their claims necessarily occurred prior to the date of filing and are "wholly past."

In the absence of specific factual allegations that Asheboro has violated the terms of its *current* permit by discharging 1,4-dioxane—which is not possible given the express exclusion of such discharge limitations—Plaintiffs cannot establish noncompliance. Plaintiffs' claims address wholly past conduct, fall outside the scope of citizen suit enforcement under the CWA, and should be dismissed.

### D. Plaintiffs Cannot State a Claim by Relying on Derived Numeric Standards

Plaintiffs' reliance on the administratively invalidated numeric criterion of 0.35 µg/L (equivalent to "0.35 ppb") as the basis for alleged violations of Rule .0208's narrative standard is legally flawed. As the OAH Final Decision determined, numeric criteria derived under Rule .0208 may not form the basis of regulatory enforcement without formal rulemaking under the NCAPA. Stated differently, a numeric criterion independently derived under Rule .0208 is not a substitute for the formal rulemaking required by law. Plaintiffs admit that rulemaking has not occurred. ECF No. 1, ¶¶ 152-57. Narrative standards cannot be retroactively reinterpreted to enforce specific numeric thresholds. *See* Final Decision, ¶¶ 30-43, at 15-19 (N.C. Office of Admin Hearings Sept. 12, 2024). Plaintiffs' attempt to impose binding obligations through "translator" formulas—and to unilaterally regulate municipalities outside of the lawful regulatory process normally exercised by government—bypasses the requisite public notice and rulemaking safeguards under the NCAPA. *Id.* ¶ 40, at 18. Plaintiffs' reliance on invalid numeric limits contravenes the NCAPA and conflicts with the

state's decision to resolve the question of its authority through the appellate process prior to the issuance of penalties.

Each of Plaintiffs' claims requires an NPDES permit violation to survive, and an NPDES permit violation may only be proven if there is a 1,4-dioxane effluent standard or limitation in place and violated by Asheboro. There is no valid effluent standard or limitation for 1,4-dioxane and the Reinstated Permit contains no related discharge limitations.[4] Thus, Plaintiffs cannot meet their burden of establishing that it is a violation for Asheboro to discharge 1,4-dioxane. Plaintiffs' claims therefore cannot survive and must be dismissed. *See* 33 U.S.C. § 1365(a)(1) (citizen suits are

[4] As further support that a 1,4-dioxane limitation does not exist to support an NPDES permit violation, EPA's objections to Asheboro's 2023 Permit rely on a state water quality standard derived under Rule .0208 to conclude that a potential CWA violation may occur. *See* Letter from Kathlene Butler, Water Div. Dir., US EPA Region 4 to Richard Rogers, Dir., Div. of Water Resources, N.C. Dep't of Env't Quality, at 2 (Jan. 3, 2025), Paragraph 167 in the Complaint and included as Attachment 29 in Exhibit A: Notice of Intent to Sue (recognizing that "40 CFR § 122.44(d)(1) specifically require[s] that NPDES permits contain effluent limitations 'necessary to achieve water quality standards under Section 303 of the CWA, including State narrative criteria for water quality.' . . . The water quality standard *giving rise to this objection* is a North Carolina narrative criterion for toxic pollutants (Rule 15A NCAC 02B . 0208), approved by the EPA as an applicable requirement for CWA purposes." (Emphasis added). The OAH Final Decision, however, declared Rule .0208 incapable of forming the basis of regulatory enforcement or a water quality standard without formal rulemaking, thus confirming that no federal or state 1,4-dioxane water quality standard exists by which to establish an NPDES violation.

authorized only for violations of "an effluent standard or limitation" of the CWA).

This conclusion extends to Plaintiffs' pass-through claims. *See* 40 C.F.R. § 403.3(p); ECF No. 1, ¶ 132 (acknowledging pass-through claims arise from NPDES permit violations tied to effluent standards or limitations).[5] Plaintiffs cannot establish that Asheboro failed to properly control pass through containing 1,4-dioxane in violation of the permit because there is no valid effluent standard or limitation for 1,4-dioxane in the Operative Permit by which to assess compliance. And significantly, there is also no valid 1,4-dioxane effluent standard or limitation in StarPet's industrial user permit issued by Asheboro, which became effective July 30, 2022. The StarPet permit expressly provides discharge limits and conditions for over forty different effluents, yet it does not contain similar limitations on 1,4-dioxane discharge. These permit conditions were approved by DEQ and signed off on by its Water Resources Director in 2022, when DEQ had full knowledge of, and

[5] To the extent Plaintiffs argue the OAH reached an erroneous decision, that litigation is on appeal and preliminarily scheduled for hearing in late 2025. If dismissal is not granted, a stay of this proceeding pending resolution of DEQ's appeal is appropriate.

reasonably contemplated, 1,4-dioxane discharges. *See* 15A NCAC 02H .0917 (governing the Division's review of pretreatment permits). DEQ expressly authorized the StarPet permit to take effect without 1,4-dioxane limits. As such, Plaintiffs' claims against Asheboro are baseless.

In addition, in accordance with federal regulations, DEQ has "assumed responsibility" for implementing the Facility's pretreatment program requirements, as DEQ has approved the program, thereby ensuring it meets federal and state pretreatment requirements and maintains compliance oversight. *See* 40 C.F.R. § 403.10(e) (providing that "a State with an approved Pretreatment Program may assume responsibility for implementing the [Facility's] Pretreatment Program requirements set forth in [40 C.F.R.] § 403.8(f) in lieu of requiring the [Facility] to develop a Pretreatment Program."). Accordingly, Plaintiffs' claims against Asheboro under 33 U.S.C. § 1317 also fall flat and must be dismissed.

**E. Alternative Request to Stay**

As discussed above, parallel state and federal proceedings are already addressing the issues Plaintiffs raise in this case. DEQ initiated proceedings to resolve

questions concerning the scope of its authority to limit 1,4-dioxane discharges, and EPA is currently reconsidering its risk evaluation and cancer-risk analysis for 1,4-dioxane—and proactively staying all affected litigation. Unopposed Motion to Hold Case in Abeyance with Motions to Govern Due In Ninety Days to Allow New Leadership to Review the Challenged Agency Actions, *Union Carbide Corp. v. EPA*, 24-60615 (5th Cir. Jan. 24, 2025); EPA's Motion for Voluntary Remand and Renewed Motion to Hold Case in Abeyance, United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO v. U.S. EPA, 24-1151 (D.C. Cir Mar. 10, 2025). EPA admitted that it must revisit whether its risk evaluations (upon which DEQ and Plaintiffs rely) were performed using the best available science. *Id.*; *see* ECF No. 1, ¶ 88. This will take between 12 and 18 months. *Id.* Accordingly, Plaintiffs' claim (based upon the same EPA studies being revisited) that 1,4-dioxane is a dangerous chemical and a carcinogen may be rendered false in a short period of time.

Accordingly, if the Court declines to dismiss the Complaint, Asheboro respectfully requests, in the

alternative, that this litigation be stayed pending resolution of: (1) the ongoing administrative proceeding; and (2) EPA's completion of its revised risk evaluation studies. Moving ahead while these related actions are unresolved risks inconsistent adjudications and requiring the parties and Court to invest significant time and resources that may be rendered moot. *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 70–71 (D.C. Cir. 2022) (courts "routinely stay [their] hand when parties identify developments that are likely to render judicial resolution unnecessary"); *In re Cotton Yarn Antitrust Litig.*, No. 1:04-MD-1622, 2006 U.S. Dist. LEXIS 26369, at *10 (M.D.N.C. Jan. 31, 2006) (stating that "jurisprudential concerns" may warrant a stay).

## **CONCLUSION**

For these reasons, the City of Asheboro respectfully urges the Court to grant its Motion to Dismiss under Rules 12(b)(1) and 12(b)(6). Plaintiffs' Complaint lacks a jurisdictional basis, fails to state a plausible claim under applicable law, and attempts to circumvent the carefully structured regulatory framework established by Congress and implemented by the relevant agencies. Dismissal will conserve

judicial resources and appropriately defer to the ongoing state and federal proceedings already addressing the very issues Plaintiffs seek to litigate prematurely in this forum.

This the 28th day of July, 2025.

**CRANFILL SUMNER LLP**

BY: /s/ Stephen J. Bell
STEPHEN J. BELL
N.C. State Bar No. 44211
CHAD E. RHOADES
N.C. State Bar No. 48041
R. ROBERT EL-JAOUHARI
N.C. State Bar No. 49184
5440 Wade Park Boulevard, #300
Raleigh, NC 27607
Telephone: (919) 828-5100
Facsimile: (919) 828-2277
E-mail: sbell@cshlaw.com
crhoades@cshlaw.com
rjaouhari@cshlaw.com
*Attorneys for Defendant, The City of Asheboro*

**CERTIFICATE OF WORD COUNT**

The undersigned certifies that this Brief complies with Local Rule 7.3(d)(1). The number of words in this Brief, exclusive of the caption, signature lines, certificate of service, certificate of word count, and any cover page or index, does not exceed 6,250 according to the word count function of the word processing software used to prepare the Brief.

By: /s/ Stephen J. Bell
STEPHEN J. BELL

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 28, 2025, the foregoing ***Memorandum of Law in Support of Defendant's Motion to Dismiss, or, in the Alternative, for a Stay Of Proceedings*** was filed electronically with the Clerk of the United States District Court for the Middle District of North Carolina using the CM/ECF system which will send notification of this filing and an electronic copy of the same to all counsel of record registered with the CM/ECF system.

**CRANFILL SUMNER LLP**

BY: /s/ Stephen J. Bell

STEPHEN J. BELL
N.C. State Bar No. 44211
CHAD E. RHOADES
N.C. State Bar No. 48041
R. ROBERT EL-JAOUHARI
N.C. State Bar No. 49184
5440 Wade Park Boulevard, #300
Raleigh, NC 27607
Telephone: (919) 828-5100
Facsimile: (919) 828-2277
E-mail: sbell@cshlaw.com
crhoades@cshlaw.com
rjaouhari@chslaw.com
*Attorneys for Defendant, The City of Asheboro*